**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 95-20758

CHARLIE LIVINGSTON,

Petitioner-Appellant,

versus

GARY JOHNSON, Director, Texas Department
of Criminal Justice, Institutional Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

February 27, 1997

Before DUHÉ, WIENER, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Charlie Livingston ("Livingston"), a Texas death-row inmate, appeals the district court's dismissal of his petition for a writ of habeas corpus under 28 U.S.C. § 2254 and requests a certificate of probable cause ("CPC") from this Court to appeal the district court's decision. We treat Livingston's request for CPC as a request for Certificate of Appealability ("COA"). Livingston insists that his conviction and death sentence are rendered unconstitutional by a list of alleged errors, including ineffective assistance of counsel, the district court's refusal to hold an evidentiary hearing, suggestive pretrial identification procedures, and various defects in the jury instructions. After a careful review of the applicable law, we conclude that the district court did not err in rejecting Livingston's contentions. We therefore refuse to issue a CPC (now COA) and dismiss the appeal.

**BACKGROUND**

At approximately 8:00 p.m. on the evening of August 10, 1983, Janet Caldwell left her home and drove to the Weingarten's grocery store located at West 43rd Street and Oak Forest Drive in Houston, Texas. She parked her black Chevrolet pickup truck in the parking lot on the west side of the store. After she finished shopping, Caldwell left the store carrying two bags of groceries and a purse, and walked through the parking lot to her truck. She was shot and killed in the parking lot moments later. Several eyewitnesses testified to events they observed that night.

Ernest Warren saw Caldwell as she was leaving the store between 8:00 and 8:45 p.m. that night.

Lynne Coleman had pulled into the Weingarten's parking lot and was parked in front and to the left of Caldwell's truck when she observed the arms of two people struggling and heard a gunshot.

Joe Cunningham was shopping at Weingarten's at approximately 8:30 p.m. He shopped for about thirty minutes, left the store, and was placing his groceries in his car when he heard a woman screaming. He looked up and saw a struggle between a black male and a white female with light brown hair. He took a few steps in the direction of the people struggling and then whistled and yelled at them to try to stop the altercation. Then, Cunningham saw the black male push away from the female, or shove her back, and then pull out a pistol and shoot the woman. Immediately thereafter, the black man spun around, fell forward on one knee, and then took off toward the west of the parking lot. Cunningham noticed that the man was wearing a white cloth over his face and dark clothing with white letters on the front of his shirt. The man had a gun and a purse when he ran from the scene. About ten minutes later, a police car pulled up to the scene with a black male seated in the back. The man was wearing dark clothes with white lettering on the front of his shirt and was sweating profusely. At trial, Cunningham identified Livingston as the man who was in the back of the police car and, based on his appearance and clothing, the man in the police car looked like the same person who had done the shooting.

2

Raul and Flor Monzon were in a car crossing the intersection of Oak Forest Drive and West 43rd Street when Flor heard a woman scream and a gunshot. Raul pulled the car into a Gulf Service Station across the street from the Weingarten's parking. They observed a black man running through the parking lot toward a dumpster. The man was wearing a white mask and was carrying a gun and a lady's purse. He was wearing dark clothing with white lettering on the front of his shirt.

Donald Austin was walking toward the entrance of Weingarten's when he heard a scream. Austin turned around, saw nothing unusual, and proceeded walking. Then, he heard another scream, turned around, and ran toward the sound of the scream. As he ran, he heard a gunshot or shots and saw the flash of a gun as it was fired. He saw a black man wearing dark clothes with lettering on the back of his shirt. The black man ran around the back of a truck toward Oak Forest Drive, tripped, appeared to drop something at a dumpster, and then turned north on Oak Forest Drive.

Jerry Thompson was working at the Gulf Station on Oak Forest Drive when he heard screams and a gunshot. Then, he saw a black man back away from a pickup truck, run toward the station, and hide behind a dumpster. Thompson observed that the man was wearing dark clothes with something white over his face. The man was carrying a purse and a gun, which he pointed at Thompson and his co-worker, Donald McDaniel. The man then crossed the street, went behind the Gulf Station, and then ran north on Oak Forest Drive into a residential subdivision.

Lavern Morton went to Weingarten's between 8:00 p.m. and 9:00 p.m. After buying groceries, Morton heard two screams and shots when he was leaving the store. He looked in the direction of the screams and saw a struggle between a black man and a white woman. The black man ran west, turned north on Oak Forest Drive, stopped at a dumpster to drop something, and then turned north on Oak Forest and ran out of sight. At trial, Morton positively identified Livingston as the man he saw struggling with Caldwell.

Several other eyewitnesses either identified Livingston in court as the shooter or identified him as the shooter when he was brought to the crime scene on the night of the murder, or both.[1]

---

[1]These witnesses were Donald McDaniel, a high school student who worked with Jerry Thompson

Houston police officers James Curtis and Margie Curtis were on patrol on West 43rd Street when they stopped to check with officer David Cook who was conducting a routine traffic stop. An unknown man drove up and informed the officers that a shooting had occurred in the Weingarten parking lot. The officers left immediately for the scene of the crime. Upon arriving at the scene, the Curtises noticed a black man in the dimly lit area behind the Weingarten store. When the man saw the police car, he began walking in the opposite direction. The officers pulled up to the man, got out of the police car, and approached him. James Curtis asked the man if he knew anything about the shooting at Weingarten's. The man denied any knowledge about the shooting and claimed that he had been shopping inside Weingarten's. The man was not carrying any groceries; he was sweating profusely, and his pants were ripped from his knee to his crotch. James Curtis asked the man for identification, to which the man replied that he had forgotten his wallet. At trial, both officers identified the man as Livingston.

James Curtis asked Livingston if he would accompany the officers to the scene while they investigated the shooting. Livingston agreed, and after a quick pat search he was placed in the back of the police car. The officers drove to the Weingarten parking lot. Upon arriving at the scene, Margie Curtis exited the car and approached officer Cook. At that moment, Cook was broadcasting a description of the suspect over police radio. Margie Curtis informed Cook that they had a man in the back of the patrol car that matched the description. Several eyewitnesses viewed Livingston in the back of the patrol car and identified him as the shooter. The officers arrested Livingston and read him his Miranda rights. A set of car keys was found in Livingston's pocket and the officers found his car parked behind the Gulf Service Station.

Officer Troy Blando arrived at the scene and observed the victim lying on the parking lot face up with a gunshot wound to her throat. He observed a spent 9mm cartridge casing near Caldwell's body and a purse flap beneath her body. Blando found the remainder of the victim's purse near the dumpster at the west end of the parking lot. Blando also found a piece of white cloth covering a

at the Gulf Station; Mary Norton; and Bruce Norton.

4

9mm pistol under a bush. Additional investigation by Blando uncovered four footprints in the soil leading away from the crime scene near where the police stopped Livingston. A cast was made of one of the footprints and compared with Livingston's tennis shoes. At trial, Wesley Sheldon, a fingerprint examiner, testified that there was a high probability that Livingston's shoes made the imprint.

The officers took Livingston to the police department and attempted to run a trace metal test on his hands and chest. Livingston resisted vehemently and had to be physically restrained from rubbing his hands together. Officer J.K. Jones conducted the test and observed a purplish black pattern on Livingston's right hand. Due to an accident, however, the lights were temporarily turned off. Livingston took the opportunity to spit on his hands and chest, thereby ruining the trace metal test.

A lineup was conducted just after midnight. Livingston occupied the center position of five persons. He was the stockiest of all the participants and was the only one wearing clothes similar to the ones worn by the assailant. Flor Monzon, Lawrence Morton, and Walter Koivula[2] all positively identified Livingston at the lineup. All other witnesses identified him tentatively.

Officer R.D. Anderson interviewed Livingston. He claimed to have ripped his pants at work and denied any involvement in the murder. Later, Livingston confessed to the murder, but neither side introduced the confession at trial. On August 10, 1983, Livingston was charged with the capital murder of Janet Caldwell. Counsel for Livingston sought a suppression hearing alleging that the showup and lineup were unduly suggestive and that, during both, Livingston lacked the presence of counsel. Following the hearing, the confession was not suppressed, nor were in-court identifications based on the showup. However, in-court identifications based on the lineup were suppressed because the state failed to show that Livingston was apprised of his right to counsel before the lineup.

**PROCEDURAL HISTORY**

Livingston was prosecuted for capital murder in the 180th District Court of Harris County, Texas. A jury convicted him of capital murder on April 17, 1985, and subsequently returned

---

[2]Mr. Koivula was not called to testify by the State at trial.

affirmative answers to the special issues of former Tex. Code. Crim. Proc. Art. 37.071. The Texas Court of Criminal Appeals affirmed Livingston's conviction and sentence on October 21, 1987. Livingston v. State, 739 S.W.2d 311 (Tex. Crim. App. 1987). Livingston's petition to the United States Supreme Court for a writ of certiorari was denied on June 20, 1988. Livingston v. Texas, 487 U.S. 1210, 108 S. Ct. 2858 (1988).

On June 9, 1989, Livingston's June 13, 1989 execution date was postponed in order to allow the 180th District Court for Harris County, Texas, to consider Livingston's state petition for habeas corpus. On November 15, 1994, Judge Patricia Lykos, the presiding judge at Livingston's trial, entered findings of fact and conclusions of law recommending the denial of state habeas relief. On December 12, 1994, the Court of Criminal Appeals denied the writ application on the basis of those findings and set Livingston's date of execution for on or before sunrise, January 26, 1995.

On January 19, 1995 Livingston filed his first federal petition with the United States District Court for the Southern District of Texas. On January 20, 1995, U.S. District Court Judge, Ewing Werlein, Jr., granted Livingston's Stay of Execution and reset the hearing date to respond to the motion on the merits. Following the respondent's answer and motion for summary judgment, on June 13, 1995, the court granted the motion for summary judgment, and denied Livingston's habeas petition on the merits. On June 27, 1995, Livingston filed a timely motion pursuant to F.R.C.P. 59(e) to alter, amend, or in the alternative, to reopen the judgment. The court denied that motion on August 29, 1995. Thereafter, Livingston timely filed his notice of appeal to this Court.

## DISCUSSION

Livingston raises four contentions that merit our consideration. First, Livingston insists that the district court denied him due process by improperly refusing to hold an evidentiary hearing. Second, Livingston claims that he was denied a fair trial because he did not receive effective assistance of counsel during either the guilt-innocence or punishment phases of his trial. Third, Livingston claims that his federal constitutional right to due process was violated by suggestive

6

pretrial identification procedures. Fourth, Livingston argues that his constitutional right to due process was violated by both the trial court's definition of the mens rea of "intent" in the jury charge and the trial court's refusal to instruct the jury on the lesser-included offense of felony murder. We reject each of these contentions.

## I. Standard of Review

"A petitioner must first obtain a Certificate of Probable Cause in order for jurisdiction to vest with this court." Baldree v. Johnson, 99 F.3d 659, 660 (5th Cir. 1996). To obtain a CPC, the petitioner must make a "substantial showing of the denial of a federal right." Id. (citing Barefoot v. Estelle, 463 U.S. 880, 882 (1983) (internal quotations and citations omitted). To satisfy this requirement, petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are 'adequate to deserve encouragement to proceed further.'" Barefoot, 463 U.S. at 893 n.4.

## II. Application of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").[3]

We first address the question of whether the AEDPA is applicable to Livingston's contention that he did not receive a proper hearing to resolve his claim of ineffective assistance of counsel at the punishment phase of the trial. Livingston filed his application for a CPC prior to April 24, 1996, the effective date of the AEDPA. The pre-AEDPA standards governing the presumption of correctness afforded state-court factfinding (subsection (d)) were somewhat less stringent than the new subsection (e) of the AEDPA. The AEDPA altered the legal standard for granting habeas relief to state prisoners based upon violations of their federal constitutional rights. See 28 U.S.C. § 2254 (d). In Drinkard v. Johnson, 97 F.3d 751, 756 (5th Cir. 1996), we held that §§ 102 and 104 of the AEDPA applied to pending habeas cases and that a habeas appellant's application for a "certificate of probable cause" ("CPC"), the procedural requirement before the AEDPA was enacted, appropriately could be treated as an application for a COA, without violating the retroactivity dictates of Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed2d 229 (1994).

---

[3]Pub. L. No. 104-132, 110 Stat. 1214 (1996).

Nonetheless, because Livingston's claims are framed in terms of the pre-AEDPA standard and because we conclude that he is not entitled to habeas relief under either standard, we will review his claims under our pre-AEDPA precedents.

## III. Evidentiary Hearing

Livingston contends that the district court erroneously applied the law regarding the presumption of correctness accorded to state-court factfindings. Specifically, Livingston claims that the state court findings are not entitled to a presumption of correctness because the "factfinding procedure used by the state court was not adequate to afford him a full and fair hearing" and "he did not receive a full, fair, and adequate hearing in the state court proceeding." In fact, Livingston asserts that he "simply received no hearing at all in state court." Id.

The pre-AEDPA version of 28 U.S.C. § 2254(d) read as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit--

(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;
(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding . . . .

And in an evidentiary hearing in the proceeding in the Federal court, . . . unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), . . . the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

(Emphasis added.) Livingston relies upon the exceptions in sections 2254(d)(2) and 2254(d)(6), contending that the state court factfinding procedure was not adequate and he did not receive a full, fair, and adequate hearing. He contends that although the state habeas judge had also presided at the trial, she did not have a meaningful way to compare the credibility of the witnesses she had seen at trial with that of the affiants for the habeas proceeding. Moreover, since the state court's fact determinations turned on the credibility choices where some witnesses "appeared" only on paper, his "paper hearing" was inadequate to afford him a full and fair hearing within the meaning of 28 U.S.C. § 2254(d).

Livingston did receive a hearing during the state habeas proceedings. We have consistently upheld the validity of "paper hearings." Baldree, 99 F.3d at 659; Sawyers v. Collins, 986 F.2d 1493, 1504 (5th Cir.), cert. denied, 113 S. Ct. 2405 (1993); May v. Collins, 955 F.2d 299, 310 (5th Cir.), cert. denied, 504 U.S. 901 (1992). "Hearing," as used in § 2254(d), does not require a trial-type hearing at which live testimony is presented and the accused has the opportunity to cross-examine witnesses. Amos v. Scott, 61 F.3d 333, 346-48 (5th Cir.), cert. denied, 116 S. Ct. 557 (1995). In Sawyers, we expressly rejected the argument that a federal court must hold a hearing if the state court decided factual issues without the benefit of live testimony. 986 F.2d at 1504. There, we stated that this court "has 'dealt on several occasions with factfinding by affidavit at the state trial court level, and each time [has] found the procedures adequate for the purpose of 2254(d)—even where the factual conclusions depended on credibility determinations.'" Id. at 1504 n.19. Moreover, we have held that the presumption of correctness is accorded to state-court factfindings in the absence of a live evidentiary hearing even though the same judge presides over the habeas proceedings and the trial. Ellis v. Collins, 956 F.2d 76, 79 (5th Cir. 1992).[4]

---

[4]Judge Patricia Lykos presided at Livingston's trial and the state habeas proceeding. She entered findings of fact and law, concluding that "there are no controverted, previously unresolved facts material to the legality of the applicant's confinement which require an evidentiary hearing." Findings of Fact and Conclusions of Law and Order, issued November 15, 1994.

The factfinding procedure applied by the state court was adequate and Livingston did receive a full, fair, and adequate hearing. Livingston concedes the validity of "paper hearings" and attempts to distinguish his case based on the following argument. Since his mother was "the only affiant from the state habeas proceeding whose live testimony had been presented at trial, . . . the state habeas judge had no meaningful way to compare the credibility of the witnesses she had seen with the affiants." This argument is meritless.

In Sawyers, we held that the state habeas judge could observe "on the face of Sawyers' relatives' affidavits, indicia that those affidavits lacked credibility" even though the judge had never witnessed the affiants' live testimony in order to observe their demeanor. There, we pointed out that the affidavits lacked credibility because they were Sawyers' relatives' affidavits, and they "contain[ed] identical accounts" of the relevant assertions. Sawyers, 986 F.2d at 1505. "Consequently, it is apparent that those affidavits were not prepared by the affiants themselves, and do not represent a spontaneous, unrehearsed account of the facts." Id.

Here, as in Sawyers, the affidavits of the witnesses — Odessa Livingston, Irma Joseph, Shirley Livingston, Louise Killings, and Perry Killings — all contain similar allegations detailing the alleged abuse that Ernest Stewart, the boyfriend of Livingston's mother, inflicted upon Livingston as a child. Yet, the affidavits are wholly at odds not only with Livingston's trial attorneys' affidavits, but also with the information gathered from Livingston and his family in connection with the certification proceedings and the subsequent pre-sentence investigation report on Livingston's prior charges of attempted murder. Ex parte Livingston, No. 20, 422-01 at 270, 277 278, 672, 702. Judge Lykos was in the best position to determine the credibility of Livingston's mother, Livingston's two trial attorneys' affidavits, and the affidavits submitted by Livingston's relatives and friends. Accordingly, the state court had more than enough reason to conclude that the affidavits submitted by Livingston were unreliable and lacked indicia of credibility.

Ultimately, Judge Lykos issued the following findings:

F.166. The court finds that prior to trial, trial counsel made a reasonable attempt to investigate the applicant's background for mitigating evidence to be presented during the punishment phase. Specifically, trial counsel engaged in the following:
(1) met with the applicant several times in an unsuccessful attempt to secure names of potential character witnesses;
(2) interviewed family members and friends whose names were supplied by the applicant's mother to determine who, if any, would be suitable character witnesses;
(3) reviewed the State's file on the attempted murder case including the Pre-Sentence Investigation report and the results of a psychological evaluation conducted by Dr. James Rice in July 1979; and
(4) reviewed the Court's file on the applicant's certification to be tried as an adult in the attempted murder case, including Dr. Robert Sarmiento's January 1979 report concerning his psychological evaluation of the applicant.

F.183 The Court finds that there are no controverted, previously unresolved facts material to the legality of the applicant's confinement which require an evidentiary hearing.

The district court considered Livingston's motion for an evidentiary hearing in light of the presumption of correctness accorded to state habeas court findings of fact and denied his motion because Livingston "alleged no new facts in his petition or in his Motion for Evidentiary Hearing, which, if true, would entitle him to a hearing on whether his trial counsel was ineffective for failing to investigate his alleged child abuse."

We conclude that the "paper hearing" Livingston received on his habeas claim was full, fair, and adequate. Furthermore, the state-court factfindings procedure was adequate to afford Livingston a full and fair hearing, notwithstanding the state court's decision not to hold an evidentiary hearing. Judge Lykos, having heard the testimony at trial, could determine the credibility of the affidavits submitted without holding a hearing concerning Livingston's claims regarding the ineffective assistance of counsel at the punishment phase. Thus, the federal district court was entitled to give the presumption of correctness to Judge Lykos' finding that a live evidentiary hearing was not required. Finally, absent evidence to indicate that the presumption of correctness afforded to state-court factfindings should not attach to Judge Lykos' findings, it is not necessary for a federal court to hold a live hearing. Baldree, 99 F.3d at 663. Livingston has presented no such evidence.

11

## IV. Ineffective Assistance of Counsel

Livingston next claims that his conviction and sentence are unconstitutional because he was denied effective assistance of counsel.[5] The gravamen of Livingston's argument is that he was denied effective counsel by (1) trial counsel's use of the mistaken identity defense at the guilt-innocence phase of the trial and (2) trial counsel's failure to investigate and develop a mitigating case at the penalty phase of the trial. In addition, Livingston attacks the legal standard the district court applied to his ineffective assistance of counsel claim.

We review ineffective assistance of counsel claims under the two-prong test announced in Strickland v. Washington, 104 S. Ct. 2052 (1984). Under Strickland, Livingston has the burden of showing that his counsel's performance was deficient and that the deficient performance prejudiced his defense such that he was deprived of a "fair trial, whose result is reliable." Id. at 2063-64. Moreover, Livingston must overcome a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065.

All of Livingston's "ineffective assistance" contentions involve the application of existing law to the facts of his case. His arguments were presented fully to the state court during his state habeas proceeding, and the court entered findings of fact and conclusions of law which denied habeas relief. Thus, any review of Livingston's claim must be made in light of the findings of fact and conclusions of law entered by Judge Lykos in the state court habeas proceedings. Judge Lykos' relevant findings of fact and conclusions of law are included in the margin, and we quote those findings at length because they demonstrate the care with which Judge Lykos handled Livingston's ineffective assistance claim.[6]

---

[5]At trial, Livingston was represented by Richard Stephanow, lead counsel in the guilt-innocence phase, and Paul Licata, lead counsel in the punishment phase.

[6]F.67. During trial, witness Joe Cunningham testified to the following: On August 10, 1983, he and his son and nephew went to the Weingarten's at the intersection of Oak Forest and West 43rd at approximately 8:30 P.M. and left the store at approximately 9:00 P.M.; after placing the two boys in his car, he heard some screams from a female and looked up and saw a female struggling with a black male about 30 paces from where he was standing; he saw the black male step away from the woman, pull a pistol out and shoot the woman; the black man then took off down the parking lot

towards the dumpster; the black man had a white cloth over his face, dark T-shirt with white lettering on the front; the man was approximately 5'9" or 5'10", 175-180 pounds; the man ran holding a gun and a purse; approximately 10 minutes later he observed a black man in the patrol car wearing a dark shirt with white lettering on; the man he saw shoot the woman and the man in the back of the car had similar builds and similar clothing and the man in the car looked like the same person who had done the shooting; the man he observed in the police car was [Livingston]; he didn't get a clear view of the shooter's face; he guessed identify the defendant's face; he could identify his clothing; he based his identification of the defendant on the clothing and build. (internal citations omitted).

F.77. The Court finds that there is no evidence that the jury in the applicant's trial disregarded the instructions found in the Court's charge that authorized a conviction for capital murder only if the jury found that the applicant "intentionally cause[d] the death of Janet Caldwell by shooting Janet Caldwell with a gun . . .". (citation omitted).

F.151. The Court finds that trial counsel timely filed numerous pre-trial motions, including a motion to suppress the in-court identification of the applicant which afforded trial counsel the opportunity, pre-trial, to cross-examine the eyewitnesses while under oath. **(See Respondent's Exhibit B, affidavit of Richard Stephanow)**.

F.152. Trial counsel reviewed the State's file in its entirety prior to the applicant's trial. Such file included not only documentation concerning the instant offense, but also documentation concerning the attempted murder case for which [Livingston] was then on probation. **(See Respondent's Exhibit B, affidavit of Richard Stephanow)**.

F.154 The Court finds that trial counsel exercised reasonable diligence in attempting to secure and present witnesses to testify at the punishment phase of trial. **(See Respondent's Exhibit C, affidavit of Paul Licata)**.

F.155. The Court finds that trial counsel's decision to forego presenting the testimony during the punishment phase of trial of individuals suggested by the applicant's mother was a matter of plausible trial strategy. **(See Respondent's Exhibit C, affidavit of Paul Licata)**.

F.163. The Court finds that in light of the defensive strategy employed of not conceding the issue of identity, trial counsels' omission from its guilt/innocence argument, of any reminder to the jury that it had to find that [Livingston] specifically intended to kill the decedent before it could return a verdict of capital murder against [Livingston] was a matter of plausible trial strategy to not rely on and argue inconsistent defensive theories.

F.165. The Court finds that trial counsels' decision to not actively attempt to counter the State's implication that the circumstances surrounding [Livingston's] earlier extraneous offense of attempted murder (in which he broke into his neighbor's apartment and brutally and repeatedly knifed his neighbor and her companion over a $10 debt) constituted a random and unprovoked act of violence, was a matter of plausible trial strategy based upon careful consideration of the potential consequences of such a course of action. **See Respondent's Exhibits B and C, affidavits of trial counsel**.

F.166. The Court finds that prior to trial, trial counsel made a reasonable attempt to investigate the [Livingston's] background for mitigating evidence to be presented during the punishment phase. Specifically, trial counsel engaged in the following:
(1) met with the [Livingston] several times in an unsuccessful attempt to secure names of potential character witnesses;

A. Livingston received effective assistance of counsel at the guilt-innocence phase of trial.

Livingston contends that trial counsel was ineffective at the guilt-innocence phase of trial for arguing a mistaken identity defense instead of a defense based on an accidental shooting of Caldwell. We find that the district court and the state court correctly concluded that Livingston failed to demonstrate any deficiency in counsel's choice of defense strategies. Trial counsel thoroughly reviewed the state's file in its entirety and concluded that none of the witnesses testifying at trial could identify Livingston's face. Moreover, although the trial court did not suppress Livingston's confession, trial counsel knew the prosecution had made a motion in limine to exclude any mention of the confession.

Yet, trial counsel knew the accidental shooting theory was impossible once the trial court overruled its motion to suppress in-court identifications because Joe Cunningham testified at the

_____

(2) interviewed family members and friends whose names were supplied by the [Livingston's] mother to determine who, if any, would be suitable character witnesses;
(3) reviewed the State's file on the attempted murder case including the Pre-Sentence Investigation report and the results of a psychological evaluation conducted by Dr. James Rice in July 1979; and
(4) reviewed the Court's file on the applicant's certification to be tried as an adult in the attempted murder case, including Dr. Robert Sarmiento's January 1979 report concerning his psychological evaluation of the applicant.

F.173. The Court finds that trial counsel made a plausible strategic decision to focus on the first special issue in his closing argument. Moreover, the Court finds that trial counsel's plea for mercy on behalf of his client was also a matter of plausible trial strategy.

F.177. The Court finds that Messrs. Stephanow and Licata both enjoyed an excellent reputation in the legal community for competency and professionalism; that Mr. Stephanow, during his legal career prior to this appointment, had served as a district court judge in Harris County, Texas, and had prior capital murder trial experience as both judge and defense attorney.

C.115. Trial counsel afforded [Livingston] reasonably effective assistance during the guilt/innocence phase of trial.

C.116. Trial counsel afforded [Livingston] reasonably effective assistance during the punishment phase of trial.

F.180. The applicant has failed to meet his burden to show his counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result. Trial counsel's errors, if any, do not constitute either independently or cumulatively, ineffective assistance of counsel. This court finds that [Livingston] did receive effective assistance of counsel at all phases of his trial.

14

pretrial hearing that he saw the altercation between the shooter and the deceased. Cunningham testified that the man "broke free or shoved her out of the way and took a step and reached back and shot the lady." Livingston has failed to demonstrate any way in which Cunningham's testimony regarding the sequence of events could have effectively been challenged.[7] Consequently, the use of a mistaken identity defense was a reasonable, strategic decision based on the facts known to counsel at the time of trial.

We have held that conscious and informed decisions on trial tactics and strategy cannot merit habeas relief unless they were so ill-chosen that they permeate the entire trial with obvious unfairness. Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983). Furthermore, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689.

We hold that Livingston has failed to demonstrate any deficiency in counsel's choice of trial strategies. In light of Cunningham's testimony regarding the nature of the shooting, any defensive strategy was inherently risky. Nevertheless, the mistaken identity defense was more plausible than an accidental shooting defense. Livingston has failed to overcome the presumption that his trial counsel's defensive strategy was inside the wide range of reasonable professional assistance. Furthermore, Livingston has failed to show a reasonable probability that, had counsel utilized a different defensive strategy at trial, the result of the proceedings would have been different. Strickland, 466 U.S. at 694.

      B.      <u>Livingston received effective assistance of counsel at the punishment phase of trial.</u>

---

[7]Livingston cites to Max Courtney's affidavit for the proposition that the defense could have hired a firearms expert to testify that the shooting "could" have occurred accidentally. Appellant's Brief at 20. Because it was never presented during the state habeas proceedings, Courtney's affidavit is not properly before this Court. Livingston is not entitled to further factual development of his claims in these proceedings unless he can show cause for his failure to develop the facts in state court and actual prejudice resulting from that failure. Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992). Livingston has neither alleged nor shown cause or prejudice. Accordingly, it is improper for him now to rely on an affidavit that the state courts did not have an opportunity to review.

At the punishment phase of trial, the jury affirmatively answered three special issues submitted pursuant to Tex. Crim. Proc. Code Ann. art. 37.071(b). The special issues were as follows:

> (1) Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, Charlie Livingston, that caused the death of the deceased, Janet Caldwell, was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> (2) Do you find from the evidence beyond a reasonable doubt that there is a probability the Defendant, Charlie Livingston would commit criminal acts of violence that would constitute a continuing threat to society?

> (3) Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, Charlie Livingston, in killing the deceased, Janet Caldwell, was unreasonable in response to the provocation, if any, by the deceased?

Livingston argues that trial counsel was ineffective for failing to develop evidence that would have supported a "no" answer to the first special issue by introduction of his written confession. We do not agree and uphold the district court's finding that, based on the record, counsel "did adequately develop and argue the deliberateness issue."

Given the circumstances, counsel's choice not to bolster his non-deliberateness argument by introducing Livingston's confession was eminently reasonable. If trial counsel had introduced the confession during the punishment phase of trial, he would have damaged his credibility with the jury because they would have known that the confession had been available the whole trial despite the fact that the defense had argued mistaken identity. Moreover, it is unlikely that the jury would have believed Livingston's self-serving story about how the shooting was unintentional. Livingston has failed to demonstrate any deficiency on trial counsel's part in failing to introduce his confession at punishment.

Livingston contends that trial counsel could have softened the effect of the state's evidence that he had previously attempted to brutally murder two people. As we have noted, during the state habeas proceedings, the trial court specifically found that counsel thoroughly investigated Livingston's prior conviction for attempted murder and that their decision not to affirmatively attempt

16

to counter such evidence was a matter of "plausible trial strategy" based on careful consideration of the possible consequences.

Stephanow and Licata responded to Livingston's allegations in affidavits at the state habeas proceeding. Mr. Stephanow pointed out, initially, that being owed money "is certainly not justifiable provocation for committing the violent acts Mr. Livingston did." Affidavit of Richard Stephanow at 7. Furthermore, he stated that trying to establish that Livingston's attempted murder was not a random and unprovoked act would have been unsound trial strategy because "(1) the jury would have found it extremely offensive had we attempted to justify Mr. Livingston's actions through a provocation claim, whose genesis was an unpaid debt; and (2) why emphasize to the jury Mr. Livingston's ability to plan and execute extreme acts of violence and his willingness to resort to violence in order to get money. Both traits are present in the instant capital murder case. Why anew attention to that?" Id. Mr. Licata also responded to the allegation as well, pointing out that they were intimately familiar with the circumstances surrounding Livingston's prior attempted murder. Affidavit of Paul Licata at 7. He restated that they did not want to draw any more attention than necessary to Livingston's careful planning and execution of the brutal attack, and that there was simply no evidence to mitigate the attack. Id. Accordingly, Livingston's ineffectiveness claim fails because he cannot demonstrate any deficiency in counsel's decision not to draw attention to the facts of his underlying attempted murder conviction.

Livingston's next argument is that trial counsel was ineffective for failing to introduce evidence from Livingston's family and friends that he was "a kind and peaceable person." The state and district courts found that counsel met with Livingston several times in an unsuccessful attempt to secure names of potential character witnesses and interviewed family members and friends whose names were supplied by Livingston's mother.

In his affidavit, Licata stated that in the months preceding trial, he met with Livingston on numerous occasions to discuss the case and any possible punishment strategy. Affidavit of Paul Licata at 2. Livingston was not very helpful and would not give counsel the names of persons to

17

contact as potential witnesses for punishment.  Id.  Counsel then spoke to Livingston's mother, who supplied several names and arranged some meetings.  Id.  Trial counsel spoke with every person Livingston's mother named.  Id. at 3.  Counsel nevertheless decided against calling most of these people as witnesses for at least two reasons.  First, "anyone who knew [Livingston] well enough to testify to his good character would then also know about the incident where he stabbed his next door neighbor and her boyfriend numerous times and also the numerous incidents in the seventh grade that led to his expulsion, including grabbing and molesting a female student and pulling a knife on another student."  Id.  Second, trial counsel felt that none of the family members and friends interviewed would make a good impression on the jury.  Id.  The most "credible and impressive" of the people I interviewed was Livingston's grandfather, whose main concern was whether he could recover possession of the gun Livingston used in the murder.  Id. at 3-4.

The lower courts found that counsel made reasonable efforts in attempting to secure and present witnesses to testify at the punishment phase and that counsel's decision to forego presenting the testimony of individuals suggested by Livingston's mother was a matter of plausible trial strategy. We find that these findings and credibility choices are fully supported by the record.  Moreover, they are binding on this Court.  See Maggio v. Fulford, 462 U.S. 111, 113 (1983).  Therefore, Livingston has failed to demonstrate deficient performance by counsel in preparing for the punishment phase of trial or prejudice.[8]

C.    The district court applied the proper legal standards to
       Livingston's allegations of ineffective assistance of counsel.

Livingston argues that the district court applied an incorrect standard of review to the prejudice prong of his ineffective assistance claims.  The district court clearly set forth and applied the proper standard of review in its memorandum and order denying relief, stating as follows: "To

---

[8]Livingston further asserts that counsel should have presented mental health evidence at the punishment phase of trial, citing an affidavit and report of Dr. Randall Price.  Price's affidavit has never been presented to the state courts and, therefore, is barred by Keeney.  Nevertheless, during the state habeas proceedings, the trial court reviewed Dr. Price's report and found it lacked credibility in many respects.

18

demonstrate prejudice with respect to a conviction, 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. . . [or regarding the sentencing phase] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"  (quoting Strickland, 104 S. Ct. at 2069).

Livingston's argument that the district court refused to consider the combined or cumulative effect of counsel's errors is simply wrong.  In its memorandum and order denying Livingston's petition, the district court clearly stated that "[c]ounsel's overall performance was not 'outside the wide range of professionally competent assistance,' and any errors, viewed separately and cumulatively, did not render the result of either the guilt or penalty phase unreliable."  Furthermore, we have previously held that we will not grant federal habeas relief where the cumulative errors complained of are not of a constitutional dimension.  Derden v. McNeel, 978 F.2d 1453, 1454 (5th Cir. 1992), cert. denied, 113 S. Ct. 2928 (1993) (holding that in order to merit federal habeas relief, cumulative errors must be of constitutional dimension).   Livingston has not demonstrated either deficient performance by his trial counsel or any cumulative errors approaching constitutional dimension.  See Yohey v. Collins, 985 F.2d 222, 229 (5th Cir. 1993) (because certain errors were not of constitutional dimension and other claims were meritless, "Yohey has presented nothing to cumulate").

As we have said, the state court found that each alleged deficiency raised by Livingston did not rise to the level of a Strickland violation.  After reviewing the arguments, the record, and the applicable law, the district court below concurred with the state court and granted summary judgment, finding that Livingston's ineffective assistance of counsel claim was wholly without merit. We agree.  Accordingly, we cannot say that the state court's judgment was based upon an unreasonable application of clearly established federal law.

## V.  Pretrial Identification Procedures

Livingston argues that the showup identifications and the lineup he took part in were impermissibly suggestive and that any reliance on them would lead to a substantial likelihood of irreparable misidentification. We disagree.

The question of whether identification evidence is constitutionally admissible is a mixed question of law and fact and is not entitled to a presumption of correctness. United States v. Sanchez, 988 F.2d 1384, 1389 (5th Cir. 1993). However, the factual findings underlying the determination of the admissibility of identification testimony are entitled to that presumption. Lavernia v. Lynaugh, 845 F.2d 493, 500 (5th Cir. 1988). "The Fifth Amendment affords accused individuals due process protection against evidence derived from unreliable identifications which are based on impermissibly suggestive identification." Sanchez, 988 F.2d at 1389. Thus, we review the constitutionality of pretrial identification procedures utilizing a two-prong analysis. We first determine whether the identification procedure was impermissibly suggestive, and if so, whether there was a substantial likelihood of irreparable misidentification. Id.; see also Manson v. Brathwaite, 432 U.S. 98, 113-14 (1977). If the identification procedure is not impermissibly suggestive, the inquiry ends. Peters v. Whitley, 942 F.2d 937, 939 (5th Cir. 1991).

A. Suggestive Showup Identification

Livingston has not presented sufficient evidence to establish that the showup on the day of the crime was impermissibly suggestive. The district court analyzed the evidence and determined that under the exigency of the circumstances, officers James Curtis' and Margie Curtis' detainment and subsequent transport of Livingston back to the crime scene was constitutional. See Frank v. Blackburn, 605 F.2d 910, 912 (5th Cir. 1979) (determining that showup identification procedures conducted at the crime scene immediately following the crime not to be unnecessarily suggestive). Further, there were no facts that suggested that the police officers' actions caused the situation to become improperly suggestive thus increasing the likelihood that the identification of Livingston was unreliable. The officers' actions did not encourage any identification of Livingston as the murderer.

The eyewitnesses to the crime were present when Livingston arrived at the crime scene and some on their own initiative walked over to the police car where they identified Livingston as the assailant.[9]

Livingston himself added to the exigency of the police officers' need to detain him and return him to the crime scene. He was seen walking near the Weingarten's, wearing torn sweat pants (with fresh dirt on his clothing), sweating profusely, and he could not provide a sensible response when asked about his whereabouts by the officers.[10] Based on these facts, we are satisfied that the factual determinations made by the district court regarding the suggestiveness of the showup are correct; therefore, we need not scrutinize them any further. The showup was not impermissibly suggestive.

B. Suggestive Lineup Identification

Livingston contends that the lineup in which he was placed was impermissibly suggestive, thereby resulting in unreliable in-court identifications. The trial court suppressed the in-court identifications based on the lineup because Livingston was not shown to be apprised of his right to counsel before participating in the lineup. On habeas review, however, the district court found that the identifications had an independent basis from the lineup. We agree. We reiterate the presumption of correctness afforded factual findings underlying the determination of the admissibility of identification testimony. See Lavernia, 845 F.2d at 500. The district court cited to numerous findings of fact that revealed the independent basis of several witnesses' identification of Livingston. Based on these findings, the court determined that the trial testimony of the witnesses was entitled to a presumption of correctness. We see no reason to disturb this finding.

Three witnesses in particular—Joe Cunningham, Flor Monzon, and Lavern Morton—have clear independent bases for their identification of Livingston. Livingston attempts to refute these witnesses' identifications by pointing out alleged discrepancies between the witnesses' testimony at the suppression hearing and their testimony at trial. We, however, are not persuaded by this

---

[9]Joe Cunningham and Flor Monzon, among others, followed the officers back to their patrol car after they arrived at the crime scene and identified Livingston who was sitting in the back seat.

[10]Livingston said he was grocery shopping at Weingarten's, but was not carrying any groceries or any identification.

argument. We borrow from the district court's analysis that both Cunningham and Monzon's identifications were reliable. Cunningham testified that had he not been to the lineup he would be able to identify Livingston as the murderer "without a doubt." Similarly, Monzon testified that she recognized Livingston in the courtroom as the man she saw running away from the Weingarten's store on the night of the murder. Thus, based on the findings of fact and the trial testimony, we conclude that Cunningham's and Monzon's in-court identifications of Livingston were of an independent origin and thus were properly admitted.

Lavern Morton's in-court identification was reliable. The district court agreed with the Court of Criminal Appeals that Morton's identification was "sufficiently reliable under the facts and circumstances presented so as to be admissible." Livingston v. State, 739 S.W.2d 311, 334 (Tex. Crim. App. 1987). The district court applied the five-factor test articulated in Neil v. Biggers, 409 U.S. 188 (1972), and concluded that Morton's testimony was admissible. In Biggers, the Supreme Court applied a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. 409 U.S. at 199-200.

In applying the Biggers factors, the district court found that Morton had sufficient opportunity to view Livingston during and immediately after the commission of the crime. Morton was approximately 70 to 100 feet from the scene of the struggle, and he described the area as having "intermediate light." He testified at the suppression hearing to a struggle between a black man and a white woman, seeing the man run toward a gas station, slow down, drop something in a dumpster, and then proceed north on the next street. He testified that he viewed the perpetrator for approximately three minutes while he was fleeing the scene of the crime, not including the struggle.

Morton's degree of attention was high as the victim's screams for help initially attracted his attention. He then watched the incident and later gave the police a description of the assailant. He

described the assailant as wearing dark clothes, standing five-foot eight to five-foot ten, stocky build, and bowlegged.

Morton's identification of the assailant was certain. Without hesitation, he correctly pointed out Livingston in the courtroom at trial and described his courtroom attire. At the suppression hearing, Morton testified that upon viewing the lineup the night of the murder, he recognized a man that looked like the man he observed during the shooting and running from the scene.

Although Morton did testify that his identification of Livingston was based on seeing him both during the commission of the crime and later during the lineup, Morton did testify at trial that his in-court identification was independently based on his observations made at the crime scene and not the lineup. Specifically, Morton identified Livingston as the man he saw struggling with Janet Caldwell on August 10, 1983 in the Weingarten's parking lot. Looking at the totality of the circumstances, the district court found that Morton's in-court identification of Livingston had an independent origin from the lineup. We cannot say that the district court erred in its determination. Accordingly, we hold that Morton's in-court identification of Livingston was properly admitted. There was no constitutional error.

**VI. Improper Jury Charge**

A. Definition of the Mens Rea of "Intent"

Livingston next contends that the trial court erred by incorrectly defining the mens rea of "intent" in the jury charge that allowed the jury to convict him of capital murder without finding a specific intent to cause the victim's death. We reject this argument for two reasons. First, Livingston, by failing to make a contemporaneous objection at trial to the mens rea definition, is procedurally barred from raising the claim on habeas review. Second, as the district court concluded, the totality of the jury charge correctly instructed the jury that to find Livingston guilty, they must find that he intentionally caused the death of the victim.

It is well established that we review a district court's denial of a federal habeas review based on a state procedural ground de novo. Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995). However,

23

a federal court will not review a question of federal law decided by a state court if the decision rests on a state ground that is independent of the merits of the federal claim and adequate to support that judgment. Harris v. Reed, 489 U.S. 255, 260 (1989). "This 'independent and adequate state law' doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review." Amos, 61 F.3d at 338 (citing Coleman v. Thompson, 501 U.S. 722, 729 (1991)).

The Texas contemporaneous objection rule has long been recognized in Fifth Circuit jurisprudence. The essence of the rule is that in order for a party to preserve an issue for appellate review, that party must have made a timely objection with specific grounds for the desired ruling—unless apparent from the context.[11]  The Texas Court of Criminal Appeals clearly noted in its findings of fact and conclusions of law that Livingston was procedurally barred from raising this claim for failing to make a contemporaneous objection at trial. See Ex parte Livingston, No. 20, 422-01 at 692-93.[12] Livingston, though, argues that the Texascontemporaneous objection rule has not been "strictly and regularly" applied in Texas, but instead, has been applied in a discretionary and inconsistent manner.

 Federal constitutional law is clear that if a state court's procedural default rule is not "strictly and regularly" followed, it cannot be deemed an independent and adequate state ground barring federal habeas review. Johnson v. Mississippi, 486 U.S. 578, 587 (1988).  The district court 1oted, however, that we have implicitly held that the contemporaneous objection rule, as it regards to objections to jury charges, has been regularly followed in Texas. O'Bryan v. Estelle, 714 F.2d 365,

---

[11]Tex. R. App. P. 52 (a), states in part:
> In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context. . . .

[12]A federal court may, however,  review a denial of habeas because of a procedural default if the prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 749. Livingston, though,  has not shown that a fundamental miscarriage of justice would occur in the absence of appellate review.

24

383-85 (5th Cir. 1983).[13]  In the context of objections to jury charges, we have found no cases indicating that Texas courts do not strictly and regularly apply the contemporaneous objection rule to unobjected-to error. See generally Nichols v. Scott, 69 F.3d 1255, 1267 (5th Cir. 1995); Buxton v. Collins, 925 F.2d 816, 821-22 (5th Cir. 1991); Lauti v. State, 810 S.W.2d 176, 178 (Tex. Crim. App. 1989); Johnson v. State, 629 S.W.2d 731, 735 (Tex. Crim. App. 1981); Williams v. State, 622 S.W.2d 116, 119-20 (Tex. Crim. App. 1981).  We therefore view this as an independent and adequate ground for denying Livingston's habeas request. Accordingly, we reject this argument.

Even though we are satisfied that Livingston cannot overcome the procedural default of this claim, we will nonetheless briefly discuss his argument on the merits. The district court correctly held that any error that may have occurred with the jury instruction did not "so infect the entire trial that the resulting conviction violated due process." See Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (stating that the relevant question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned); Kinnamon v. Scott, 33 F.3d 462, 465-66 (5th Cir. 1994) (same). The district court found that the application portion of the charge correctly instructed the jury that to find Livingston guilty, they must find that he intentionally caused the death of the victim. We agree that this was sufficient to ensure the verdict's reliability. Moreover, with the plethora of eyewitness testimony and the direct and circumstantial evidence the jury was entitled to consider, we reject Livingston's argument that the jury instruction deprived him of his constitutional right to due process of law.  Accordingly, we hold that Livingston's due process argument is both procedurally barred and, in any event, substantively meritless.

B. Lesser Included Offense

---

[13]In a general context, we have recently put this issue to rest when we held that the Texas contemporaneous objection rule is strictly and regularly followed. Amos, 61 F.3d at 343.

25

Livingston contends that the trial court's refusal to give a requested jury instruction on the lesser included offense of felony murder violated his Fourteenth Amendment right to due process of law. We find this argument unpersuasive.

In support of his contention, Livingston cites Beck v. Alabama, 447 U.S. 625 (1980), for the proposition that in a capital case, a jury must be permitted to consider a verdict of a lesser included non-capital offense when the evidence would have supported such a verdict. Beck, though, is clearly distinguishable from the facts of this case. In Beck, the challenged Alabama law prohibited giving lesser included offense instructions in capital cases. Essentially, it was an all-or-nothing rule that provided juries in capital cases with only two options: (1) find the defendant guilty of capital murder and automatically sentence the defendant to death, or (2) acquit the defendant. See Beck, 447 U.S. at 642-43. This rule, the Court held, provided for possibly unreliable results and was therefore constitutionally infirm.

Here, the Texas statute does not provide such a rigid rule. Texas uses a bifurcated procedure in a capital case, wherein the jury must first make a determination of guilt and then impose a sentence of life imprisonment or death. In addition, the trial court in this case did provide a lesser included offense instruction for murder. Livingston argues that this instruction was an irrational option for the jury to consider. Specifically, he argues that because his request for the charge on felony murder was predicated on his argument that he lacked the specific intent to commit capital murder, the charge on plain murder did not help him. Livingston does not argue that he did not commit the robbery; instead, he argues that he lacked the specific intent to commit murder. This is relevant because a capital murder verdict requires a finding that Livingston intended to rob and to kill Janet Caldwell, while a felony murder verdict would have required only that Livingston have intended to rob Caldwell. Similarly, the only difference between a capital murder charge and a murder charge is the additional element in the capital murder charge that the intentional killing takes place during the commission of a felony—in this case, robbery.

First, Beck does not stand for the proposition that the jury must be provided with instructions for a lesser included offense when the capital sentencing scheme does not pose the potential for unreliable sentencing like that inherent in the Alabama sentencing scheme. This case does not involve the all-or-nothing scheme that was the basis for Beck's holding. Thus, Beck should not be extended to a sentencing scheme such as the one implicated here. See Schad v. Arizona, 501 U.S. 624, 646 (1991).

Second, we have recently rejected an argument similar to Livingston's. In Allridge v. Scott, 41 F.3d 213 (5th Cir. 1994), the petitioner asserted a due process argument because the jury also had been instructed on capital murder and murder, but not felony murder. This argument was made despite the petitioner's concession that he was guilty of the armed robbery underlying the capital murder charge. We held that the jury's capital murder verdict did not violate the petitioner's Fourteenth Amendment rights, and specifically stated:

> We recognize that had the jury returned a verdict of murder only, such a verdict would effectively acquit Allridge of robbery, a charge which he does not challenge. As illogical as this hypothetical verdict may be, it does not render the trial court's jury instructions unconstitutional because, in the final analysis, sufficient evidence existed for the jury to convict Allridge of murder. Our reading of Beck and Schad instructs us that the trial court was not constitutionally bound to provide a wider menu of jury instructions. Instead, because the jury had the viable option to choose murder over capital murder, we are satisfied that the option ensured the reliability of the jury's capital murder verdict.

Id. at 220. Livingston does not distinguish Allridge or assert a sufficiency of the evidence argument. In fact, Livingston has made no showing that the trial court's refusal to instruct the jury on felony murder was a denial of any federal or constitutional right. Accordingly, we hold that the trial court committed no constitutional error in refusing to instruct the jury on the lesser included offense of felony murder.

## CONCLUSION

For the foregoing reasons, the application for Certificate of Probable Cause, treated here as an application for Certificate of Appealability, is DENIED, and the appeal is DISMISSED.

27