**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-50669

_____


RICKY LEE GREEN,

                              Petitioner-Appellant,

VERSUS

GARY L. JOHNSON,
Director, Texas Department of Criminal Justice,
Institutional Division,

                              Respondent-Appellee.


_____

Appeal from the United States District Court
for the Western District of Texas
_____

June 27, 1997


Before SMITH, DeMOSS, and PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


     Ricky Green appeals the denial of his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254 (West Supp. 1997). Concluding that Green has failed to make a substantial showing of the denial of a federal right, we deny him a certificate of probable cause ("CPC") and vacate the stay of execution.


                              I.

     In April 1986, Green was charged with the capital murder of

Steven Fefferman.  Following his arrest, Green provided the police with a statement concerning his relationship with Fefferman. According to Green, he had met Fefferman on the eve of the murder at Casino Beach, an area known to be frequented by homosexuals. After a sexual encounter with Fefferman, Green dropped off his car at his own home and proceeded to Fefferman's home, where the two drank some beer and again engaged in sexual activity.  After Green convinced Fefferman to allow him to tie Fefferman to the bed, Green stabbed Fefferman several times.  Before leaving Fefferman's house, Green sexually mutilated Fefferman, ransacked the bedroom in search of money, and left in Fefferman's car.

## II.

Following a jury trial,[1] Green was convicted of capital murder and sentenced to death in September 1990.  During the sentencing phase, the court admitted evidence of three other murders to which Green had confessed, which murders also involved beatings and mutilation of genitalia similar to those surrounding the Fefferman murder, and also Green's stalking a seventeen-year-old girl and assaulting two teenage boys.

Green was represented during pre-trial by court-appointed counsel Jeff Kearney and Suzie Johnson.  Following a change of venue, Kearney withdrew and was replaced by David Bays.  A third

---

[1] Although Green was indicted originally in Tarrant County, Texas, in the Northern District of Texas, the case was transferred, at Green's request, to Travis County, Texas, in the Western District of Texas.  Following the trial, venue was transferred back to Tarrant County.

attorney, Kenneth Houp, also was appointed to assist in the pre-trial proceedings, although his role ended with the completion of jury selection. Green was represented throughout the trial by Bays and Johnson, on direct appeal by Johnson and Danny Burns, and on his first state habeas application by Robert Ford.

Green's conviction and sentence were affirmed on direct appeal. *See Green v. State*, No. 71,170 (Tex. Crim. App. Dec. 9, 1992) (en banc) (unpublished). The Court of Criminal Appeals later denied Green's application for habeas relief. *See Ex Parte Green*, No. 26,331-01 (Tex. Crim. App. Apr. 19, 1994) (en banc) (per curiam).

In September 1994, Green filed, in the United States District Court for the Northern District of Texas, a *pro se* motion for appointment of counsel to file a federal habeas petition pursuant to 28 U.S.C. § 2254 and for a stay of execution. After the court granted Green permission to proceed *in forma pauperis* and appointed counsel, Green filed a motion to withdraw his *pro se* pleading on the ground that jurisdiction lay properly in the Western District of Texas.

Also in September 1994, Green filed a second state habeas petition in the Tarrant County trial court, which petition was also denied by the Court of Criminal Appeals. *See Ex Parte Green*, No. 26,331-02 (Tex. Crim. App. Oct. 3, 1994) (en banc) (per curiam). Concurrently with that denial, Green filed a notice of voluntary dismissal of the Northern District habeas proceeding pursuant to FED. R. CIV. P. 41(a)(1), and filed a new petition in

the Western District.

The Western District petition was transferred to the Northern District, the situs of the indictment, which transfer the Northern District concluded was proper under *Dobard v. Johnson*, 749 F.2d 1503 (11th Cir. 1985).  On appeal we reversed, concluding that, pursuant to *Gosch v. Collins*, 20 F.3d 1170 (5th Cir.) (per curiam), jurisdiction lay in the Western District.  *See In re Green*, 39 F.3d 582 (5th Cir. 1994).

In the Western District, Green asserted thirteen grounds for habeas relief, each of which had been exhausted in state court either on direct appeal or through the state post-conviction process.  In July 1996, the district court reviewed *de novo* and adopted the findings of the magistrate judge to grant the state's summary judgment motion and to deny Green's habeas petition.  Green filed his application for a CPC in August 1996.  The district court, construing the CPC application as an application for a certificate of appealability ("COA"), denied the application in September 1996.

### III.

### A.

As a threshold matter, we must determine whether the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs the instant appeal.  Although we have held previously that the standards of review set forth in the AEDPA apply to all habeas petitions that

4

were pending on April 24, 1996, the date on which the President signed the bill into law, *see Drinkard v. Johnson*, 97 F.3d 751, 764-66 (5th Cir. 1996), we now must conclude otherwise in light of *Lindh v. Murphy*, No. 96-6298, 1997 WL 338568 (U.S. June 23, 1997).

Among other things, the AEDPA amends § 2244 and §§ 2253-2255 of chapter 153 of title 28 of the United States Code, the provisions that govern all habeas proceedings in federal courts. *See* 110 Stat. 1217-21. The AEDPA also creates, for habeas proceedings against a state in capital cases, a new chapter 154 with special rules favorable to the state, but applicable only if the state opts in by agreeing to provide for the appointment of post-conviction counsel in state habeas proceedings. *See* 110 Stat. 1221-26.

Whereas the amendments to chapter 153 do not contain an effective date, the AEDPA provides expressly that the new chapter 154 "shall apply to [state capital] cases pending on or after the date of enactment of this Act." 110 Stat. 1226. In *Lindh*, the Court construes "this provision of § 107(c) . . . as indicating implicitly that the amendments to chapter 153 were assumed and meant to apply to the general run of habeas cases only when those cases had been filed after the date of the Act." 1997 WL 338568, at *4.

> As we have already noted, amended § 2254(d) (in chapter 153 but applicable to chapter 154 cases) governs standards affecting entitlement to relief. If, then, Congress was reasonably concerned to ensure that chapter 154 be applied to pending cases, it should have been just as concerned about chapter 153, unless it had the different intent that the latter chapter not be applied to the general run of pending cases.

5

Nothing, indeed, but a different intent explains the different treatment.

*Id.* at *5.

As we have stated, chapter 154 is apposite to capital cases only where states have elected to opt in and have qualified to participate by meeting the requirements of § 107.  Because the State of Texas has not yet qualified for the expedited procedures governing habeas petitions in capital cases, *see Carter v. Johnson*, 110 F.3d 1098, 1104 (5th Cir. 1997), chapter 154 does not apply to the instant case.[2]  Thus, in light of *Lindh*'s explication that "the negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the act," 1997 WL 338568, at *8, and given that Green filed the instant petition before the April 24, 1996, effective date of the AEDPA, we apply pre-AEDPA habeas law to his claims.

B.

Before the advent of the AEDPA, a petitioner could not appeal a district court's ruling on a habeas petition that concerned detention arising from state court proceedings unless a district or circuit judge issued a CPC.  28 U.S.C. § 2253; *see also Baldree v. Johnson*, 99 F.3d 659, 660 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1489 (1997).  To obtain a CPC, the petitioner must make a "substantial showing of a denial of [a] federal right."  *Barefoot*

---

[2] *Carter*, *Drinkard*, and the rest of the post-*Drinkard* AEDPA progeny presumably remain precedent in this circuit post-*Lindh* to the extent that they interpret the provisions of the AEDPA and do not conflict with *Lindh*'s conclusion that the chapter 153 amendments do not apply retroactively.

*v. Estelle*, 463 U.S. 880, 893 (1983) (internal quotes and citation omitted).  Such a showing requires a demonstration "that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further."  *Id.* at 893 n.4.

Section 102 of the AEDPA amended 28 U.S.C. § 2253 to require that a petitioner obtain a COA.  *See* 28 U.S.C. § 2253(c)(1)).  A COA may be issued only where the applicant has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Notwithstanding the slightly different wording between the pre-AEDPA and the amended § 2253, we have noted previously that the AEDPA was intended to codify the *Barefoot* standard and thus that the standard governing the issuance of a COA requires the same showing as that for obtaining a CPC.  *See Drinkard*, 97 F.3d at 756.  Nonetheless, because Green's habeas petition was filed with the district court before April 24, 1996, *Lindh* compels that we review his petition for a CPC under the pre-AEDPA jurisprudence.

Under the pre-AEDPA standards, state court findings are entitled to a presumption of correctness unless, among other things, the petitioner demonstrates that the state courts failed to resolve the claims on the merits.  *See Livingston v. Johnson*, 107 F.3d 297, 302 (5th Cir. 1997).  Because Green argues that the state failed so to adjudicate his claims, we must determine initially whether a state court has disposed of Green's claims on

7

the merits.[3]

Green argues that the state habeas courts' "perfunctory disposition" is not a resolution on the merits because, he alleges, the petitions were denied without an evidentiary hearing[4] "and without reference to any factual or legal issue presented." According to Green, the resolution-on-the-merits prerequisite is a proxy for the quality of the legal process of resolving a dispute; the court's treatment of the petitions must evince a "careful consideration of the constitutional claims" and a thorough and meaningful substantive evaluation of the claims.

We disagree both with Green's proffered construction of the merits inquiry and with his contention that the state courts did not adjudicate his habeas claims on the merits. "Resolution on the merits" is a term of art in the habeas context that refers not to the quality of a court's review of claims, but rather to the court's disposition of the case§§whether substantive or procedural. *See Preston v. Maggio*, 705 F.2d 113, 116 (5th Cir. 1983). We must inquire, on a case-by-case basis, whether a resolution was on the merits, considering the following factors: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not

_____

[3] Green argued originally that, under the AEDPA jurisprudence, his claim has not been "adjudicated on the merits" and thus was not amenable to state court deference. Because *Lindh* requires that we construe his habeas petition under pre-AEDPA law, we treat his "adjudication on the merits" argument as one challenging the sufficiency of the merits resolution of his petitions in state court, pursuant to the former 28 U.S.C. § 2254(d)(1) & (2).

[4] We consistently have upheld the validity of paper hearings in state habeas proceedings. *See Livingston*, 107 F.3d at 303.

adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination of the merits. *See id.*

A careful review of the state courts' opinions denying Green habeas relief reveals that his claims were in fact disposed of on the merits. In denying Green's first state habeas petition, the Court of Criminal Appeals acknowledged that he presented "fourteen (14) allegations in which he challenges the validity of his conviction or sentence. The trial court recommended the relief sought be denied. This Court has reviewed the record. We agree with the trial court's recommendations and accordingly deny habeas relief."

The trial court memorandum to which the Court of Criminal Appeals refers indicates that the trial court considered Green's allegations, the state's reply, the case record, and the evidence presented by both parties before determining that habeas relief be denied. Neither the trial court's nor the Court of Criminal Appeals's order makes mention of procedural grounds for denying relief, nor has Green brought any to our attention.

With respect to Green's second habeas petition, the trial court memorandum, again to which the Court of Criminal Appeals refers in denying relief, not only indicates that "[Green's] assertions in his application for writ of habeas corpus are without merit," but specifically excludes any reliance upon procedural grounds for denying relief. The trial court concluded expressly (1) "that it is not barred from ruling upon the merits of [Green's]

9

claim by the pendency of [his] motion to dismiss in Federal District Court" and (2) that "[Green] is not procedurally barred from seeking relief on the merits of his claim." The Court of Criminal Appeals, after reviewing the record on its own, referenced the trial court's memorandum and "agree[d] with the trial court's recommendation and, accordingly, denie[d] all requested habeas corpus relief."

We are confident, therefore, that Green's habeas claims were resolved on the merits, as opposed to having been disposed of on non-merits-based, procedural grounds; the presumption of correctness therefore applies. *See Livingston*, 107 F.3d at 302-03.

IV.

A.

Green alleges that his counsel's performance at both the trial and sentencing phases was ineffective because, after having conscripted an expert (Dr. Richard Rappaport) and considered carefully his conclusions, they decided not to put on an insanity defense. Green argues that his counsel's reasons for not presenting the defense are unclear from the record; that the internal conflict within the defense team precludes a finding that the rejection of Rappaport's defense was trial strategy; and that counsel's decision was based in part upon an erroneous interpretation of the law concerning whether presentation of the defense would have opened the door to the cross-examination of Rappaport about additional incriminating informationSSnamely,

10

fifteen other murders to which Green confessed to Rappaport.

To establish ineffective assistance of counsel, Green must demonstrate both deficient performance and prejudice resulting from that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We compare counsel's performance to an objective standard of reasonableness, mindful of the strong presumption of adequacy. We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices. *See id.* at 689-90. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (on rehearing). Because an ineffective assistance claim is a mixed question of law and fact, we review the district court's decision *de novo*. *See Salazar v. Johnson*, 96 F.3d 789, 791 (5th Cir. 1996). As we noted above, findings of fact are entitled to a presumption of correctness. *See Washington*, 466 U.S. at 698.

Applying the prejudice prong in the context of counsel's performance at sentencing, we ask whether the petitioner has demonstrated "a 'reasonable probability' that the jury would not have imposed the death sentence in the absence of errors by counsel." *Carter*, 110 F.3d at 1110. Failure to establish either prong defeats the claim. *See Lincecum v. Collins*, 958 F.2d 1271, 1278 (5th Cir. 1992).

Kearney averred that he hired Rappaport to examine Green and

11

that, based upon Rappaport's conclusions that Green was in fact legally insane at the time of the Fefferman murder, he intended to make full use of Rappaport's findings during the trial and sentencing phases. After the change of venue, Kearney left the defense team and was replaced by Bays, at which time conflicts began to arise between Johnson and Bays. According to Johnson, Bays wished to use Rappaport's testimony to establish that Green's insanity turned him into a "serial killer." Believing that such a tactic would add to the state's showing of "future dangerousness" during the punishment phase of the trial, Johnson disagreed with the decision to place Rappaport on the stand, and Johnson and Bays ultimately agreed to abandon the insanity defense.[5]

Green contends that the internal wrangling between Johnson and Bays renders suspect their decision not to present an insanity defense. Although the record does demonstrate that conflict existed, Green has proffered no evidence tending to prove that the decision not to place Rappaport on the stand was infected impermissibly with whatever personal disagreements there were. To the contrary, Johnson and Bays proffered the other valid tactical

---

[5] The following exchange of notes between Johnson and Green during jury selection illustrates Johnson's tactics:

Green: "[T]ell me something Ms. Johnson, did you drop the insanity plea just to save the state money or did ya'll have something against Mr. Rappaport or is there something else"?

Johnson: "We dropped it because Rappaport's testimony would let the jury know you said you killed Wendy Robinson, some woman in Florida, and 15 other people. That proves the 'future dangerousness' question #2. I will not prove my client's future dangerousness. I will not prove up a murder (Wendy) where my client is a suspect. #2 Rappaport's conclusion that you were insane is too shallow. #3 if Rappaport testified you are 100% guaranteed D.P."

12

reasons we have mentioned.[6]

Even assuming *arguendo* that Johnson and Bays erred in concluding that Rappaport's testimony would have opened the door to additional incriminating evidence, this error alone does not give rise to a constitutional ineffectiveness claim. *See Moreno v. Estelle*, 717 F.2d 171, 176 (5th Cir. 1983) (noting that the Sixth Amendment does not guarantee an accused "errorless representation"). There is sufficient evidence demonstrating that the decision not to proffer an insanity defense was a "conscious and informed" tactical one. *See Garland*, 717 F.2d at 206.[7] No reasonable jurist would disagree, and Green has not made a substantial showing of the denial of a constitutional right.

Green's reliance on *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), and *Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987), is misplaced. In *Bouchillon,* we concluded that counsel was ineffective in failing to offer an insanity defense because (1) it was the only defense available to the defendant; and (2) although counsel was aware that the defendant had been committed previously

---

[6] In a draft report concerning his interviews with Green, Rappaport describes three other murders to which Green confessed, each involving similar stabbing and mutilation as accompanied the Fefferman murder. Green also told Rappaport that he had killed 15 other people and that he believed that he was doing the country a favor by killing "whores" and homosexuals.

[7] Green's contention that *Martinez-Macias v. Collins*, 810 F. Supp. 782 (W.D. Tex. 1991), *aff'd*, 979 F.2d 1067 (5th Cir. 1992), compels otherwise is incorrect. The deficiency in *Martinez-Macias* was counsel's complete failure to investigate the legal basis for a decision not to introduce certain evidence. *Id.* at 798 n.23. Green does not allege that his counsel failed to investigate Texas law on the admissibility of the other 15 murders but rather that, after researching the law, his counsel misunderstood the application of the law to the instant facts. Absent more, these allegations do not rise to the level of constitutional ineffectiveness.

13

to mental institutions, he did not ask for a psychiatric evaluation or conduct any other investigation. 907 F.2d at 597. We concluded the same in *Profitt* after also noting both that the defendant had only the insanity defense available to him and that, although counsel was aware that the defendant had escaped previously from a mental institution, counsel failed to investigate his client's sanity, which investigation would have revealed that the defendant had been adjudicated insane by an Idaho court only months before the instant trial. *See Profitt*, 831 F.2d at 1249. Furthermore, we gave minimal deference to the *Profitt* counsel's tactical decision not to employ the insanity defense, as we could ascertain no advantage attendant to abandoning the defense. *See id.*

Not only did Green's counsel investigate fully the possibility of putting on an insanity defense (including conscripting Rappaport to prepare a report based on extensive interviews with Green and reviewing the contents of that report), but they considered various tactical reasons attendant to their decision to present or abandon the defense. Furthermore, the defense was not the only one available to Green; his counsel presented a defense that he lacked the requisite *mens rea* to commit the underlying felony.

With respect to Green's claim that he was denied effective assistance of counsel at the sentencing phase because his counsel failed to present the Rappaport findings, we similarly find no constitutional error. According to Green, the decision to forego this testimony prevented the jury from receiving an explanation of the nexus between his mitigating evidence of child abuse, severe

14

mental illness, and brain damage and his actions in killing Fefferman.  Johnson indicated, however, that she believed that the effects of this evidence on the "future dangerousness" prong of the Texas capital murder jury questions would "100% guarantee[]" that Green would receive the death penalty.  Furthermore, the defense did present, through Dr. Randall Price, evidence of Green's abusive childhood and mental disorders and their effects upon his ability to conform his behavior to acceptable levels.[8]  Thus, we agree with the district court that Green has not made a substantial showing of the denial of a federal right with respect to his counsel's decisions not to use Rappaport's testimony.

## B.

Green asserts that his counsel were ineffective in failing to cross-examine Robert Ressler effectively during the punishment phase of the trial.  Ressler was a state witness who testified that he had been involved in the largest survey of serial murderers ever conducted and that, based upon this experience, he considered Green to be an "organized serial killer."

Although Johnson avers that she had prepared to cross-examine Ressler, Bays decided, on the spur of the moment, to conduct the cross-examination without having done sufficient investigation or preparation.  Bays did question Ressler concerning his credentials, his understanding of Texas law, how potential affiliations affected

_____

[8] Green also presented, during the trial phase, substantial mitigating evidence that described a litany of abusive actions he suffered at the hands of his father while growing up.

15

his impartiality, and his understanding of the connection between abused children and serial killers. Green contends that had Ressler been cross-examined properly, he could have (1) challenged Ressler's conclusions that he posed a continuing risk of future danger, (2) demonstrated that his research methods were unreliable and inaccurate, and (3) shown that Ressler's own writings suggest a link between the traumatic childhoods of serial killers and their subsequent murders.

Assuming *arguendo* that the cross-examination of Ressler was deficient, Green has failed to demonstrate "a 'reasonable probability' that the jury would not have imposed the death sentence in the absence of errors by counsel." *Carter*, 110 F.3d at 1110. First, Ressler testified during the rebuttal portion of the punishment phase, at which time the jury already had heard in detail about three other similarly-situated murders to which Green had confessed. Thus, to the extent that Ressler testified regarding Green's future dangerousness, Green has failed to disentangle the effects of evidence of the other murders from Ressler's more abstract research-based testimony. That is, even assuming that the proffered cross-examination of Ressler would have destroyed his credibility with the jury, Green has not demonstrated a reasonable probability of prejudice.

Second, not only did Bays's cross-examination of Ressler elicit some support for the defense's primary theory that Green's behavior was a product of his abusive childhood, but Green also had presented Price's testimony to that effect during the punishment

16

phase, as well as other corroborative testimony during the guilt phase.  Again, Green has not demonstrated sufficiently that eliciting Ressler's further agreement with the defense theory would have enhanced, with sufficient probability, the jury's acceptance of the defense's underlying theory.  Reasonable jurists would not find the issue debatable, and therefore Green has not made a substantial showing of the denial of a federal right.

V.

A.

Green contends that he was denied his constitutional right to be present at all phases of his trial when he was denied access to an *ex parte* hearing among his counsel and the judge, during which the court entertained Johnson's oral motion to withdraw from representation.  Green concedes that his absence from the hearing does not infringe upon his confrontation right but argues that it offends his due process right to a fair trial.

A defendant has a right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)).  His absence from such a proceeding amounts to a due process violation only "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *Snyder*, 291 U.S. at 105-06.

17

The oral motion to withdraw was made and discussed during an *ex parte* conference in chambers (in the course of jury *voir dire)* and centered on disagreements between Johnson and Hays. According to Johnson's affidavit, her relationship with Bays had deteriorated to the point that they no longer conferred directly regarding the case, but rather communicated through Houp only. Johnson expressed her frustrations regarding this situation to the court and requested that she be permitted to withdraw from representation. The court denied the motion, and, although stating that it would keep the motion under advisement in the event that the working relationship continued to worsen, the matter was not raised again.

Although Green protests that he was prejudiced by his exclusion from the meeting, we fail to see how his absence thwarted the fairness and just treatment of the issues at the *ex parte* communication or with respect to his overall representation. Green contends that had he been present, "he could have provided the trial court with important information about the conflict that would have effected [sic] the court's ruling." But, Green does not give us the contents of such information or the effect it would have had on the ruling.

Furthermore, we reject Green's suggestion that his absence from this meeting prevented him from becoming aware of any disputes between his counsel and thus from exercising his right either to take over his own defense or to request new counsel. Not only did Johnson admit in her affidavit that "the animosity between Mr. Bays and me was clear to everyone in the courtroom," thus calling into

18

question Green's protested ignorance, but we also do not believe Green has made a substantial showing that he was denied effective assistance because of his inability personally to request a change of counsel that the court denied upon request from Johnson. *See Bass v. Estelle*, 696 F.2d 1154, 1158-59 (5th Cir. 1983).

B.

Green argues further that the failure of his counsel on direct appeal to raise the issue of his absence from this hearing denied him the effective assistance of counsel on direct appeal. To this end, Green relies upon TEX. CODE CRIM. PROC. ANN. art. 33.03 (Vernon 1986) and *Adanondus v. Texas*, 866 S.W.2d 210, 216-19 (Tex. Crim. App. 1993). Assuming *arguendo* that Green's absence from the meeting ran afoul of art. 33.03, *Adanondus* counsels that harmless error analysis applies to the statutory violation. *See id.* at 219. *Adanondus* instructs further that the harmless error analysis is informed by the *Snyder* "reasonably substantial relationship" test. Thus, because we reject Green's *Snyder* claim with respect to his absence from the hearing, we conclude similarly that any error of his counsel on direct appeal was harmless.

VI.

Green avers that his direct appellate counsel's failure to raise the issue of the exclusion for cause of veniremember Harren deprived him of effective assistance. At trial, Green's attorney objected to the exclusion of Harren, arguing that it is

19

impermissible to grant a challenge for cause where a juror is unable to answer affirmatively the second special issue on the facts of the capital offense alone. The trial court correctly overruled Green's motion, relying upon *Marras v. Texas*, 741 S.W.2d 395 (Tex. Crim. App. 1987) (en banc).

At the time of Green's appeal, *Marras* was the controlling precedent, and Green's appellate counsel therefore decided not to raise Harren's exclusion for cause on direct appeal. The Court of Criminal Appeals affirmed Green's conviction on December 9, 1992, and his motion for rehearing, filed on December 13, was denied on February 12, 1993. On January 13, 1993, the Court of Criminal Appeals decided *Garrett v. Texas*, 851 S.W.2d 853 (Tex. Crim. App. 1993) (en banc), overruled *Marras*, and held that a veniremember is not subject to a challenge for cause merely because he indicates that he would require more evidence than the legal minimum in order to answer special issue two affirmatively. 851 S.W.2d at 860-61. *Garrett* did not become final and binding on lower courts until rehearing was denied on April 21, 1993. *See Thorpe v. Texas*, 863 S.W.2d 739, 741 n.5 (Tex. Crim. App. 1993) (en banc).

Green does not dispute that *Marras* governed his appeal but contends that his appellate counsel was deficient for failing to raise the *Marras* issue both on his original appeal and during the pendency of Green's rehearing petition, but before *Garrett* became final. With respect to the former claim that Green's counsel should have raised the *Marras* issue on his original appeal, we have noted previously that there is no general duty on the part of

20

defense counsel to anticipate changes in the law, *see Nelson v. Estelle*, 642 F.2d 903, 908 (5th Cir. Unit A Apr. 1981), and that counsel is not ineffective for failing to raise a claim that Texas courts have rejected repeatedly. *See Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir. 1994). Because it is undisputed that *Marras* was controlling authority at the time of Green's original appeal, Green has not made a substantial showing that his appellate counsel's failure to raise the *Marras* issue in the original appeal denied him effective assistance.

We also reject Green's ineffectiveness claim stemming from counsel's failure to assert *Garrett* during the pendency of his rehearing petition, but two months before *Garrett* became final. Counsel is not deficient for failing to raise every meritorious claim that may be pressed on appeal. *See Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989).

The only record evidence submitted by Green on this issue is an affidavit by Burns, one of Green's direct appellate counsel, stating, "I reviewed the record and identified what is now known as *Garrett* error. I also noted that the error was properly preserved. Neither my co-counsel, Suzie Johnson, nor I raised the issue on appeal." Given that *Garrett* was not yet final and that Burns and Johnson had identified the issue as one they did not wish to press on appeal, their performance was not constitutionally deficient. *See Washington*, 466 U.S. at 688-94.

21

VII.

Green contends that the trial court erred in failing to admit the testimony of Dr. John Marquart during the punishment phase. Marquart testified on *voir dire* that he had conducted a study of capital prisoners whose sentences had been commuted, in which he compared those prisoners to murderers who had received life imprisonment. His comparisons revealed that many of the prisoners whom juries had found to pose a threat of future dangerousness (special issue two) in fact posed no such threat. As a result, Marquart concluded that it is difficult, if not impossible, to determine whether a particular defendant poses a direct threat of future danger. Marquart opined further that he did not believe that the death penalty deterred crime; that studies indicated that a short-term increase in crime accompanies an execution; and that there is little correlation between the operation of the death penalty and the number of homicides in Texas.

The sentencer in a capital case must be permitted to consider any constitutionally relevant mitigating evidence, *see Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), which is evidence "directly related to the personal culpability of the criminal defendant," *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). "Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)). It is error to exclude evidence opining that the defendant would not commit acts

22

of violence in the future.  *See Robinson v. Texas*, 548 S.W.2d 63, 66 (Tex. Crim. App. 1977) (en banc).

The state court determined on direct appeal that, because Marquart's proffered testimony related only to a generalized critique of the accuracy of the future dangerousness prediction, and not to Green's own future dangerousness or to Green's individualized assessment of punishment, it was properly excluded. We do not believe that the state court's factual findings were clearly erroneous, nor do we find any legal error.

## VIII.

Green has failed to make a substantial showing of the denial of a federal right.  Accordingly, we DENY a CPC and VACATE the stay of execution.