UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-10673
_____

PAUL SELSO NUNCIO,

Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
(5:99-CV-025)
_____

January 24, 2000

Before WIENER, BARKSDALE, and STEWART, Circuit Judges.

PER CURIAM:[*]

Paul Selso Nuncio, convicted and sentenced to death for a December 1993 capital murder, seeks a certificate of appealability (COA) to appeal the denial of his federal habeas application. **DENIED.**

I.

In affirming Nuncio's conviction on direct appeal, the Texas Court of Criminal Appeals described in detail the evidence presented at the trial in 1995. *Nuncio v. State*, No. 72,121 (Tex. Crim. App. 5 Feb. 1997)(unpublished). Our review of the record confirms that there is ample evidentiary support for that

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

description.  A detailed summary of that evidence, drawn largely from the Court of Criminal Appeals' opinion, is necessary, however, for consideration of Nuncio's fact-intensive ineffective assistance of counsel claims, including factors such as whether he knew right from wrong at the time of the offense.

On 2 December 1993, Nuncio and six others (the group), each of whom testified at trial, consumed alcoholic beverages in Plainview, Texas.  It was raining after midnight on 3 December; the group went to the porch of the house owned and occupied by Pauline Farris.

Each group member testified that, although they made a good deal of noise while there, they did *not* see any lights or hear any sounds from inside the house.  Nuncio attempted unsuccessfully to "hot-wire" Farris' car.  When the rain subsided, all but Nuncio left.

Between 2:00 and 3:00 a.m. on 3 December, Nuncio sold a television to a guest at the Warrick Inn.  When the purchaser observed blood on Nuncio, he explained that he had been helping a friend with some sheep.  Nuncio returned to the purchaser's room about 45 minutes later with a camera, a stereo, and some rings; he sold the camera and stereo for $20 and threw the rings in a trash can.  At the purchaser's request, Nuncio gave him a written receipt and confirmed his identity by showing his driver's license and writing the number on the receipt.

At approximately 4:25 a.m. on 3 December, after observing Nuncio standing at a street corner, a Plainview Police Officer asked for identification.  Nuncio stated that he did *not* have any,

2

and misidentified himself as Joe Nuncio, from Frederick, Oklahoma. Because Nuncio seemed disoriented and confused, the Officer administered field sobriety tests, but concluded that Nuncio was *not* intoxicated. At Nuncio's request, the Officer took him to an apartment complex.

Shortly thereafter, Nuncio encountered an acquaintance, Brooks, and asked him to take him to "his house" to pick up a television. In fact, Nuncio directed Brooks to Farris' house, where he picked up a television from the porch. Then, Nuncio had Brooks take him to the Warrick Inn, where he attempted unsuccessfully to sell the television. The prospective buyer noticed blood on Nuncio.

Nuncio and Brooks next went to the Airport Motel. Between 5:00 and 5:30 a.m., Nuncio went to the room of Navarro and Ruiz; both had been in the group. Navarro declined Nuncio's invitation to go drinking. Ruiz noted that Nuncio "was all drunk".

About 6:30 a.m., Nuncio went to Lopez's room at the Airport Motel; Lopez was the daughter of Villalon, who had been in the group. Nuncio offered to sell her the television; she told him to come back later. Nuncio eventually sold it to a friend of Villalon. Later, when Nuncio went back to Lopez's room, she confronted him about what appeared to be blood on his boot; Nuncio did *not* respond, but simply stared at her and left. When Lopez went to her mother's room, Nuncio walked in and began cleaning his boot, explaining that it had ketchup on it.

3

Late that morning, Nuncio asked Lopez and her husband to take him to Lubbock, Texas; they refused. Later that afternoon, Nuncio told Villalon he needed money to leave town and was going to a loan company. Nuncio applied for a $150 loan at the loan company, stating he needed it for "newborn stuff". When the loan officer questioned him about that purpose, in the light of the fact that he had written on the application that he was single, Nuncio admitted that he wanted the money for a trip, but thought the loan would *not* be approved for that purpose. When the loan officer discovered that Nuncio was *not* employed by the employer listed on the loan application, the loan was denied.

Earlier that day, Farris' neighbors found her on her living room floor. Her house had been ransacked. When investigators arrived, they observed she was nude, lying face down. She was *not* wearing any rings, and her bottom denture plate was lying several feet from her body. The forensic pathologist who conducted the autopsy testified that Farris (who was 61) had been sexually assaulted and severely beaten, and died of asphyxia as a result of manual strangulation.

On 5 December, Nuncio became a suspect. After police recovered a television, identified the next day by Farris' daughter, an arrest warrant was issued. He was arrested two days later, after police found him hiding in a closet in a house in Plainview.

At the police department, Nuncio voluntarily gave oral and written statements in which he stated that: he was an addict; he

4

had been molested as a child; he was "messed up" on drugs and alcohol the night of the murder and decided to break into Farris' house to steal items he could sell to get money for more drugs; he did not think anyone was in the house but, after he broke in, he saw Farris and they began fighting; he hit and kicked her, knocking her down until she no longer attempted to get up; he put two televisions and a stereo on the front porch and some rings in his pocket; he saw that Farris was naked and decided to "have sex" with her; and he did *not* mean to kill her and did *not* know she was dead until he heard about it later. A detective testified that Nuncio was emotional and cried during his two-hour post-arrest interview.

In a consensual search, clothing and boots Nuncio wore on the night of the murder were recovered. The DNA analysis of a blood sample from a boot indicated a 98.8% probability of a match to Farris' blood.

At the guilt/innocence phase of trial, the jury, having been instructed on the lesser-included offenses of murder, burglary of a habitation, aggravated sexual assault, and robbery, convicted Nuncio for capital murder.

At the punishment phase, the State presented evidence that Nuncio had been convicted for felony theft in 1990 and had been subsequently convicted for two misdemeanor thefts. Five law enforcement officers testified that his reputation as a peaceable and law-abiding citizen was bad. His probation officer testified that Nuncio was a "sorry" probationer who was unable to maintain

5

employment; and that he was a dishonest, passive-aggressive type who never learned to obey rules.

The justice of the peace who arraigned Nuncio for capital murder testified that he appeared to think the arraignment was "a comical situation, [a] very funny situation". Two inmates testified that, while in jail post-arrest, Nuncio watched a television broadcast about Farris' murder; when an inmate remarked that whoever had killed her was going to be famous, Nuncio smiled and said, "yeah, I'm going to be famous".

Elsa Martinez, who lived with Nuncio for about three years and had two children by him, testified that: Nuncio had a bad temper when he was drunk; he had *not* visited their children since 1989; and he had once struck her. A cousin and an acquaintance of Nuncio testified that they had never known Nuncio to have had a steady job.

In response to a hypothetical question based on the evidence, the State's expert witness, Dr. Coons, a forensic psychiatrist, opined that: the hypothetical subject would take advantage of weaker persons; was willing to engage in violent behavior to get what he wanted; did *not* have a conscience with respect to theft, lying, responsibility to family, sexual exploitation, rape, and killing, and was cold and heartless; and, there was a significant probability he would hurt someone else.

Smithey, a Texas Department of Criminal Justice investigator, testified that: stealing is a major source of violence in prison; inmates with violent histories are often recruited into prison

6

gangs; inmates can obtain drugs and alcohol; and an inmate with a tendency to steal, who had been convicted of a violent, brutal crime, and who tends to become violent when intoxicated, would probably continue to commit acts of violence in prison. On cross-examination, Smithey described statistics reflecting that 40% of all capital murder defendants in prison had committed an act of criminal violence while there; and that 25% of inmates sentenced to death had committed acts of violence while in prison.

For the defense, Coke, a licensed drug and alcohol counselor, testified that a substance abuse test performed on Nuncio revealed addictions to alcohol and drugs. Dr. Taylor, a forensic psychiatrist, testified that psychiatric evaluations were accurate predictions of behavior only about a third of the time. Dr. Wall, a clinical psychologist, testified that, on average, the accuracy rate for predictions of future dangerousness tended to be about one in eight, and were never better than one in three. Another clinical psychologist, Dr. Quijano, testified that, based on a review of his probation and jail records, Nuncio would do well in prison; and that the Texas prison system had attempted to control violence more effectively in recent years by improving the classification of prisoners and reducing overcrowding.

One of Nuncio's aunts testified that: he was neglected as a child and had been placed in an orphanage for a time; and she had never seen him do anything violent or aggressive. Another aunt testified that: Nuncio's stepfather was involved with drugs and stealing; she had never known Nuncio to be aggressive; and his

7

father "has never been there for him".  Nuncio's younger brother testified that:  he and Nuncio used marijuana at a young age; his father's second wife punished them by hitting them with a wire hanger and then putting them in a closet; and Nuncio had been sexually molested by his cousins.

In fixing punishment, the jury answered "yes" to the first special issue:  whether it found "from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society".  It answered "no" to the second: whether it found "from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed".  Therefore, in March 1995, Nuncio was sentenced to death.

When Nuncio entered the penitentiary that August, he was examined and found to have *no* mental illness.  However, six to nine months later, he was diagnosed by prison medical personnel as paranoid schizophrenic.  Later entries in his prison medical records cast some doubt on that diagnosis; for example, in April 1997, he was diagnosed with *no* indication of schizophrenia, and other records suggest possible malingering.

In early 1997, the Court of Criminal Appeals affirmed the judgment and sentence on direct appeal.  ***Nuncio v. State***, No.

8

72,121 (Tex. Crim. App. 5 Feb. 1997) (unpublished). Nuncio did *not* seek review by the United States Supreme Court.

That prior November, counsel had been appointed to represent Nuncio in state habeas proceedings. The state application, filed in August 1997, presented 19 claims, including ineffective assistance of counsel for failure to investigate Nuncio's psychological history. The state trial court conducted an evidentiary hearing in March 1998. That testimony, discussed below, is the supporting evidence for this COA application. Once again, a detailed description is required.

Hall, appointed to represent Nuncio on direct appeal, testified that: when he met with Nuncio in May 1995, he noticed he had a "nervous type of laugh" at inappropriate times; and he had been concerned about Nuncio's reported laughter during trial and at arraignment. On cross-examination, he testified that: Nuncio appeared to be competent when he met with him; he saw nothing to suggest Nuncio was mentally ill, other than the way he laughed; he did *not* see anything in the record to suggest Nuncio was insane at the time of the offense, other than he had been sexually abused in the past, had problems with the probation office, and had an alcohol problem; and there was *not* much mitigating evidence introduced at trial, but there "were a lot of things that could have been looked into for mitigation".

The justice of the peace who arraigned Nuncio for capital murder, and who, as noted, had testified at the punishment phase, testified at the evidentiary hearing that: at arraignment, Nuncio

9

had a "cocky" attitude and acted as though he thought it was a comical, funny situation; but Nuncio understood the nature of the charges against him.

The former Officer who had testified at trial about his encounter with Nuncio on the night of the murder testified at the evidentiary hearing that: Nuncio appeared dazed, confused, and disoriented when he had first encountered him; but he had concluded, based on field sobriety test results and the fact he did *not* smell any alcohol, Nuncio was *not* intoxicated.

Stoffregen, Nuncio's appointed trial counsel, testified that: he had *no* pre-trial indication Nuncio was *not* competent; Nuncio was *not* very helpful in communicating his memory of events on the night of the murder; and, because he had difficulty obtaining expert witnesses, he decided *not* to have Nuncio examined by a mental health expert, because he did *not* want to "burn" an expert needed to testify at the punishment phase. This meant, if the expert examined Nuncio, the expert could *not* be called as a witness regarding future dangerousness, because the State could discover the examination results. Counsel admitted, however, he could have tried to exclude the examination results through a motion in limine, but was *not* sure such a tactic would have been successful.

On cross-examination by the State, Stoffregen testified that: he had *no* indication before trial an insanity defense might be available; he investigated Nuncio's background by talking with his family and obtaining school records and criminal history; and he

10

asked questions calculated to elicit information regarding mental illness if it existed.

LaFont, appointed co-counsel for trial, testified that: he had *no* difficulty communicating with Nuncio; he did *not* believe an insanity defense was available; he interviewed Nuncio's aunts, brother, and mother, and inquired about Nuncio's background; and his questions should have resulted in disclosure of psychological problems, had any existed. On cross-examination by the State, LaFont testified he saw *no* reason to request that Nuncio be examined for sanity or competency.

Coffman, a private investigator hired by Nuncio's state habeas counsel, testified that: he attempted to locate family members and other witnesses who could testify about Nuncio's mental history; and he spoke with Cecelia Dominguez, who was married to Nuncio's father for 15 years, and received some information regarding the possibility of Nuncio having talked to a counselor when he was young, but Nuncio's father did *not* know when the counseling took place or anything about the counselor.

Nuncio's father, who had *not* testified at trial, testified at the evidentiary hearing that: Nuncio's lawyers or investigators did *not* talk to him prior to trial; he was *not* called to testify at trial; he took Nuncio to a counselor when Nuncio was a child, because he had problems with memory, learning, "hearing things", and "imagining stuff"; Nuncio had a hard time communicating with people; Nuncio did *not* seem to have a good sense of what was right or wrong; and Nuncio reminded him of a schizophrenic character in

11

a movie.  On cross-examination, he admitted that:  he heard about Nuncio's trial a few days before it started, but did *not* attend because he had just begun a new job and could *not* afford to take time off; and Nuncio's brother and mother both knew about Nuncio having visited a counselor and about the problems he had been experiencing at that time.

Nuncio's mother, who had testified during the punishment phase, testified at the evidentiary hearing that:  Nuncio's lawyers and investigators did *not* ask her about his having mental problems; and she did *not* remember Nuncio having mental problems while he lived with her.  In fact, the Oklahoma Health Department records about Nuncio's counseling include a statement by Nuncio's mother:  "Paul is a very smart [and] active boy.  He does not have a hearing or speech problem.  He always tells me his problems [and] talks to me....  Paul does mine [*sic*] me, his real mother but does not like step-mother because she miss treats [*sic*] him".

Cecelia Dominguez, married, as noted, to Nuncio's father for approximately 15 years, and who had *not* testified at trial, testified at the evidentiary hearing that:  Nuncio and his brother came to live with her and the father when they were ages eight and nine, and again in June 1980, when they were 10 and 11; she did *not* attend trial; Nuncio's lawyers and investigators never talked to her; and she took Nuncio to a counselor three times when he was in the fifth grade because he was having learning problems, was hoarding food in his room, had a short attention span, and had difficulty communicating.

12

Four of the jurors from Nuncio's trial testified that, if there had been evidence Nuncio suffered from mental illness, they would have considered it in reaching their verdict at the punishment phase.

Dr. Wall, the forensic psychologist who had testified for Nuncio at the punishment phase, testified at the evidentiary hearing that: "[t]here most certainly was a possibility" Nuncio was insane at the time of the offense; and he would have suggested a psychological evaluation had he been aware of Nuncio's Oklahoma counseling, disorientation and confusion on the night of the murder, behavior at arraignment, inappropriate smiling during jury selection, and the statements by his father and stepmother regarding his behavior as a child. On cross-examination, he testified he could *not* say Nuncio was mentally ill at the time of the offense, but only that there was a probability; and he had *not* examined Nuncio.

Dr. Taylor, the psychiatrist who had testified for Nuncio at the punishment phase, testified at the evidentiary hearing that: he would have suggested a psychological or psychiatric evaluation prior to trial, had he been aware of Nuncio's Oklahoma counseling, disorientation and confusion on the night of the murder, and inappropriate behavior at arraignment and trial; and such information would have been valuable for his mitigating evidence testimony. On cross-examination, he testified that he could *not* give an opinion on insanity, because he had *not* examined Nuncio and did *not* have sufficient information about Nuncio and the crime.

13

Dr. Quijano, the clinical psychologist who had testified for Nuncio at the punishment phase, testified at the evidentiary hearing that: prior to trial, he was *not* made aware of any issues regarding insanity or mental health relating to mitigation; he evaluated Nuncio approximately two years after the trial (April and August 1997), and found he suffered from paranoid schizophrenia; it was likely Nuncio was mentally ill at the time of the offense, but he could *not* say with certainty whether Nuncio was legally insane then; the offense report did *not* suggest Nuncio was insane; the defense should have investigated Nuncio's disorientation and confusion on the night of the murder and his inappropriate arraignment and trial behavior as possible symptoms of mental illness; and there would have been a "richer presentation" of mitigating evidence had Nuncio been examined pre-trial by a mental health expert.

On cross-examination, he admitted that: before trial, he had received copies of offense reports, jail records, and probation records (including the report of Nuncio's confusion and disorientation on the night of the murder, and the "going to be famous" jail-statement); Nuncio's behavior on the night of the murder (attempting to hot-wire Farris' car, giving a false name to the Officer, and systematically selling Farris' property) showed he was goal-oriented and knew right from wrong; there was *nothing* in the Oklahoma counseling records to suggest Nuncio suffered from mental illness; the Oklahoma records, Nuncio's disorientation on the night of the murder, and his inappropriate attitude at

14

arraignment, taken together, did *not* suggest mental illness; and, when he examined Nuncio in 1997, Nuncio knew that the conduct for which he had been convicted was wrong.

On redirect, Dr. Quijano testified he would have suggested a mental examination if the information about Nuncio's childhood problems had been available to him pre-trial. On re-cross, he stated he was *not* testifying an insanity defense was available, and could *not* testify Nuncio did *not* know the difference between right and wrong.

Dr. Coons, the forensic psychiatrist who had testified for the State during the punishment phase, did likewise at the evidentiary hearing — that: Nuncio's behavior following the murder showed he knew his conduct was wrong; an insanity defense had *not* been available; and the Oklahoma records contained nothing indicating the need for a psychiatric evaluation for an insanity defense. On cross-examination, he testified that: if he were working for the defense and had all of the information about Nuncio's childhood problems, he would bring up the possibility of a mental health evaluation, but would warn defense counsel that, from a tactical standpoint, it might develop information that would *not* be in the best interest of the client.

Gonzales, a mitigation specialist appointed to assist Nuncio pre-trial, testified that: Nuncio exhibited unusual behavior during trial preparation and at trial, such as wanting to use a Tejano music tape at trial and inappropriate laughter and smiling at trial; and he did *not* interview Nuncio's father or stepmother,

15

because he was directed elsewhere by Nuncio, but should have done so, because it would have affected the outcome of the case. On cross-examination, he acknowledged that having a capital murder client evaluated by a mental health professional could be risky, because the prosecution might be able to obtain information damaging to the client.

Following the evidentiary hearing, the trial court entered very detailed findings of fact and conclusions of law, recommending that relief be denied. The Court of Criminal Appeals denied habeas relief in September 1998, adopting the findings and conclusions. *Ex parte Nuncio*, No. 38,356-01 (Tex. Crim. App. 23 Sept. 1998) (unpublished).

In January 1999, the district court appointed the same attorney who represented Nuncio in state habeas proceedings to represent him in the federal proceedings; the federal petition was filed that March. That May, the district court granted the State's summary judgment motion and denied habeas relief. A COA was denied in June.

## II.

Nuncio contends he is entitled to a COA because of ineffective assistance of counsel at his trial's guilt/innocence and punishment phases. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies, Nuncio having filed for federal habeas relief after its effective date. *See* *Green v. Johnson*, 116 F.3d 1115, 1119-20 (5th Cir. 1997). Pursuant to AEDPA, "[u]nless a circuit justice or judge issues a [COA], an appeal may not be taken to the

16

court of appeals from ... the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court". 28 U.S.C. § 2253(c)(1)(A).

To obtain a COA, Nuncio must "ma[k]e a *substantial showing* of the denial of a constitutional right". 28 U.S.C. § 2253(c)(2) (emphasis added). "A 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further'". *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (emphasis in original; quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)), *cert. denied*, 520 U.S. 1107 (1997), *overruled in part on other grounds*, *Lindh v. Murphy*, 521 U.S. 320 (1997).

Under AEDPA, we may *not* grant habeas relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Nuncio does *not* dispute that the state courts adjudicated the merits of his claims; accordingly, the § 2254(d) standards apply. Therefore, to obtain a COA, he must make the

requisite *substantial showing* that, in the light of those standards, the state habeas court erred.

"[P]ure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)". *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir.), *cert. denied*, ___ U.S. ___, 119 S. Ct. 613 (1998). Therefore, when reviewing a question of law, we defer to the state court's ruling unless its "decision rested on a legal determination that was contrary to ... clearly established federal law as determined by the Supreme Court". *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 521 U.S. 1123 (1997). Likewise, we "will not disturb a state court's application of law to facts unless the state court's conclusions involved an 'unreasonable application' of clearly established federal law as determined by the Supreme Court". *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir. 1998) (quoting 28 U.S.C. § 2254(d)(1)), *cert. denied*, ___ U.S. ___, 119 S. Ct. 1474 (1999). A state court's "application of federal law is unreasonable only when reasonable jurists considering the question would be of one view that the state court ruling was incorrect". *Id*. at 812 (internal quotation marks and citation omitted). State court factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Davis*, 158 F.3d at 812.

18

The ineffective assistance claims on which Nuncio premises his COA request are governed by *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors *so serious* that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were *so serious* as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis added).

Whether counsel's performance was deficient, including the adequacy of his pretrial investigation and the reasonableness of a particular strategic or tactical decision, and whether the deficiency, if any, prejudiced the defense, are legal conclusions, reviewed under § 2254(d)(1). *See Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) (applying pre-AEDPA law); *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997), *cert. denied*, 523 U.S. 1099 (1998) (applying pre-AEDPA law). But, "a state habeas court's determination that counsel conducted a pretrial investigation or that counsel's conduct was the result of a fully informed strategic or tactical decision" are factual determinations reviewed under § 2254(d)(2). *Moore*, 194 F.3d at 604.

The state court applied *Strickland*. Nuncio does *not* contend that, consistent with § 2254(d)(1), its decision is "contrary" to

19

Supreme Court precedent. Accordingly, in order to obtain a COA, he must make a *substantial showing* that, pursuant to § 2254(d)(2), the state court made "an unreasonable determination of the facts", or that, pursuant to § 2254(d)(1), its "application" of **Strickland** was "unreasonable".

The claimed substantial showing for the first ineffective assistance prong, *deficient performance*, is based on three factors: (1) the investigation was inadequate because counsel neither interviewed Nuncio's father and stepmother nor discovered his Oklahoma counseling records; (2) counsel failed to obtain a psychological evaluation of Nuncio and, as a result, did *not* present an insanity defense at the guilt/innocence phase; and (3) because of these first two deficiencies, counsel failed, at the punishment phase, to present evidence of Nuncio's mental health history. The claimed substantial showing for the *prejudice* prong, resulting from the claimed deficient performance, is that Nuncio was prevented from: (1) presenting an insanity defense at the guilt/innocence phase; and (2), at the punishment phase, using his history of mental illness (a) to rebut the State's future dangerousness evidence, and (b) in mitigation.

A.

1.

Regarding the investigation, the state habeas court found that: counsel thoroughly investigated Nuncio's background and the facts surrounding the commission of the offense; Nuncio understood the nature of the charges against him and was able to communicate

20

with counsel about the case; and, based on interviews with Nuncio and his answers regarding his prior mental health history, the focus of the defense investigation was directed toward areas that did *not* include mental health issues.  The court concluded that counsel did *not* render deficient performance by failing to interview Nuncio's father and stepmother and failing to discover the Oklahoma records, because, in conducting their investigation, they reasonably relied on the information Nuncio provided the defense team.

Nuncio contends that these findings and conclusions are unreasonable, asserting that the court's reliance on trial counsel's evaluation of Nuncio was misplaced.  Nuncio points to trial counsel's testimony that he had limited contact with Nuncio; and that Nuncio did *not* communicate well and could only remember parts of the night of the crime, as demonstrating that counsel performed deficiently by basing the scope of his investigation on information he obtained from Nuncio, and by failing to talk to his father and stepmother, which would have led to discovery of the Oklahoma records.  Nuncio concedes that those records do *not* reveal mental illness, but maintains that, pre-trial, had his experts been made aware of them, they would have recommended a psychological evaluation, which would have revealed his mental illness.

He contends further that his bizarre behavior (disorientation and confusion on the night of the murder, inappropriate attitude at arraignment, "going to be famous" jail-statement, inappropriate smiling during trial, and insistence on using Tejano music then),

21

and counsel's awareness that Nuncio had been sexually abused as a child, together with counsel's knowledge that such abuse can lead to mental illness, should have alerted counsel that Nuncio had mental health problems which warranted further investigation and evaluation by a mental health expert.

For this point, Nuncio has *not* made the requisite substantial showing that the state court unreasonably determined counsel performed an adequate investigation. The information Nuncio provided to counsel and the investigator did *not* direct them to his father or stepmother, or to any issues regarding his mental health; and Nuncio did *not* inform counsel about the counseling. Moreover, Nuncio's father testified that Nuncio's mother and brother, *both of whom testified at the punishment phase*, were aware of that counseling. They chose *not* to disclose that information to the defense team, despite questioning by counsel and the investigator designed to elicit it.

Because Nuncio appeared to the defense team to have a rational understanding of the trial proceedings, neither counsel nor the investigator had reason to doubt his depiction of his own history. As the Supreme Court stated in *Strickland*:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what defendant has said,

22

> the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigative decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland*, 466 U.S. at 691.

Likewise, the evidence does *not* provide the requisite substantial showing that the state court unreasonably determined counsel did *not* perform deficiently by failing, based on Nuncio's behavior, to recognize a possibility of mental problems. All three of the attorneys appointed to represent him at trial and on direct appeal testified at the evidentiary hearing that: he understood the proceedings and was able to communicate with them; and they saw *no* indication that an insanity defense might be available, or that he might be mentally ill. As noted, Dr. Quijano testified at the habeas evidentiary hearing that: despite being aware pre-trial of Nuncio's behavior on the night of the murder, of his jail-statement, and of his attitude at arraignment, he did *not* suggest defense counsel should investigate whether such behavior was a symptom of mental illness; and those incidents, taken together, did *not* suggest mental illness.

2.

The state habeas court found that counsel made a strategic decision *not* to have Nuncio examined by one of the appointed mental

23

health experts because counsel did *not* want to "burn" an expert who could rebut the State's psychiatric experts. It concluded that the challenged decision was a reasonable trial strategy in the light of Nuncio's *no* mental health history representation and of counsel's knowledge of the effectiveness of the State's psychiatrist.

Nuncio contends that these findings and conclusions are unreasonable, because: trial counsel admitted at the habeas evidentiary hearing he would *not* have had to "burn" one of the experts; there were many available psychologists who could have conducted an evaluation; and, even if counsel had used one of Nuncio's experts to evaluate him, he could have filed a motion in limine, thus making it possible for that expert to testify without fear that, on cross, damaging information would be revealed about the evaluation. Relying on the testimony of Drs. Wall and Quijano at the evidentiary hearing, Nuncio contends that, had an evaluation been conducted, there is a "strong probability" his mental illness would have been discovered.

Nuncio has *not* made the requisite substantial showing. His selective references to trial counsel's testimony do *not* portray accurately counsel's explanation for *not* having Nuncio examined by one of his experts. Counsel acknowledged that, had he attempted to have an evaluation conducted secretly, there was always a possibility the State could find out about the examination, through jail personnel or cross-examination. Moreover, Nuncio omits any mention of the other reasons counsel chose *not* to have him evaluated: Nuncio's *no* history of mental problems representation;

24

counsel's observation of Nuncio, which revealed *no* hints of mental illness; and counsel's decision that all of the experts were needed to rebut the testimony of the State's expert psychiatrist, whom counsel knew to be an effective witness.

In a related contention, Nuncio maintains that the state habeas court's conclusion that counsel made a reasonable and informed strategic decision *not* to pursue an insanity defense is unreasonable, because it is based on the erroneous assumption that counsel made a thorough investigation, and overlooks counsel's concession that he had *no* defense. This challenged conclusion was based on findings that: counsel was familiar with the insanity defense and had raised it on behalf of other clients; after talking to and observing Nuncio, and investigating his background and the facts, counsel had *no* indication an insanity defense was available; Nuncio's behavior in committing the crime, his efforts to conceal his identity, and the detail of his confession revealed he knew the difference between right and wrong when he committed the crime; and there was *no* evidence Nuncio was insane at the time of the offense.

Nuncio has *not* made the requisite substantial showing. There is *no* evidence that an insanity defense was available to Nuncio. He was *not* diagnosed with any mental illness *until at least six months after his conviction*. Even after examining Nuncio twice in 1997, Dr. Quijano was unable to testify that Nuncio was legally insane at the time of the crime. Moreover, Nuncio's post-arrest statement to the police, and his actions between the time of the

25

murder and arrest, establish, as conceded by Dr. Quijano, that he knew his conduct had been wrong.

3.

The state habeas court found that counsel effectively presented extensive mitigating evidence and, by use of expert witnesses, family members, and cross-examination, competently rebutted the State's punishment evidence. It concluded that the record did *not* support a conclusion that mental illness was available as mitigating evidence.

Nuncio contends that these findings and conclusions are unreasonable, asserting that they are based on the contested conclusion that counsel conducted an adequate investigation and a reliable evaluation of Nuncio. But, as discussed, he has *not* made the requisite substantial showing in that regard. Accordingly, his mitigating evidence claim likewise fails.

B.

Because Nuncio has *not* made the requisite *substantial showing* concerning performance, we need *not* consider the prejudice prong. *See* **Strickland**, 466 U.S. at 687. But, even assuming the requisite showing for performance, he has *not* made a substantial showing that the state court unreasonably determined his defense was *not* prejudiced thereby.

The state habeas court concluded that Nuncio was *not* so prejudiced, because it could *not* be established he suffered from a mental illness until *after* his post-conviction admission to the penitentiary.

26

1.

Nuncio contends that the fact that there was *no* defense asserted at trial, together with the possibility that he was insane, raises a question about the reliability of the result at the guilt/innocence phase. But, as stated, there is *no* evidence he was insane at the time of the offense; indeed, there is substantial evidence, detailed *supra*, he knew his conduct had been wrong. Accordingly, he was *not* prejudiced by the decision *not* to present an insanity defense.

2.

Next, Nuncio maintains that deficient performance prejudiced him at the punishment phase by preventing him from using his claimed history of mental illness in mitigation and to rebut the State's future dangerousness evidence. He asserts that, had such evidence been presented, there is a reasonable probability the jury would have answered the special issue on mitigation differently. And, noting that the State portrayed his bizarre, inappropriate behavior as evidence of his guilty conscience and lack of remorse, he maintains there is a reasonable probability the jury would have answered the future dangerousness special issue differently, had that evidence been rebutted by mental illness evidence, which could have been used to explain his bizarre behavior as a symptom of his illness, rather than as evidence of his lack of conscience.

Nuncio has *not* made the requisite substantial showing that he was prejudiced in this regard at the punishment phase. Trial counsel presented the testimony of three mental health experts

27

(Drs. Ross, Taylor, and Quijano) to rebut the State's future dangerousness evidence. And, counsel presented substantial mitigating evidence, including Nuncio's remorse, parental neglect, time in an orphanage, mistreatment by one of his stepmothers, addiction to drugs and alcohol and intoxication at the time of the offense, and possible sexual abuse as a child. Moreover, as the state habeas court ruled, the evidence did *not* support a conclusion that, pre-conviction, Nuncio suffered from a mental illness.

### III.

Because Nuncio has *not* made the requisite substantial showing regarding claimed ineffective assistance of counsel at trial, a COA is

***DENIED.***